**UNITED STATES, Appellee,**

v.

**David ELWELL, Defendant, Appellant.**

**UNITED STATES, Appellee,**

v.

**Hobart WILLIS, Defendant, Appellant.**

**UNITED STATES, Appellee,**

v.

**Richard MORETTO, Defendant, Appellant.**

**Nos. 91–1621, 91–1674 and 91–1742.**

United States Court of Appeals, First Circuit.

Heard Sept. 16, 1992.

Decided Jan. 20, 1993.

Stephen J. Weymouth with whom Balliro, Mondano & Balliro, P.C., Boston, MA, was on brief, for appellant David Elwell.

Dana Alan Curhan, Boston, MA, with whom Barry M. Haight and Buckley, Haight, Muldoon, Jubinville & Gilligan, Milton, MA, were on brief, for appellant Hobart Willis.

James J. Cipoletta with whom Cipoletta & Ogus, Revere, MA, was on brief, for appellant Richard Moretto.

George W. Vien, Asst. U.S. Atty., with whom A. John Pappalardo, U.S. Atty., and Heidi E. Brieger, Asst. U.S. Atty., Boston, MA, were on brief, for appellee.

Before SELYA, Circuit Judge, CAMPBELL, Senior Circuit Judge, and BOUDIN, Circuit Judge.

BOUDIN, Circuit Judge.

The grand jury indicted a number of persons for conspiring to distribute cocaine and for related offenses. Several of those indicted pled guilty but three were tried jointly and convicted. The appeal of one of those convicted is decided today in a separate decision. *United States v. Moran*, 984 F.2d 1299 (1st Cir.1993). In this decision, we address the appeals of the other two defendants who were convicted at trial, together with the appeal of another defendant who pleaded guilty but contests his sentence. In two of the three cases we affirm; and in one we remand on a single issue for resentencing.

## I.

■ We begin with a brief outline of the facts and history of the case, reserving additional detail for our discussion of individual claims of error. The evidence submitted to the jury is, of course, to be viewed in the light most favorable to the verdict, the jury being accorded great latitude in resolving credibility and drawing reasonable inferences. *United States v. Rivera–Santiago*, 872 F.2d 1073, 1078–79 (1st Cir.), *cert. denied*, 492 U.S. 910, 109 S.Ct. 3227, 106 L.Ed.2d 576 (1989).

On August 9, 1990, the grand jury indicted the three appellants now in this court (Richard Moretto, David Elwell, and Hobart Willis), as well as six other persons, for conspiracy to distribute cocaine. 21 U.S.C. § 846. Other counts in the indictment charged various of the defendants with related crimes. Willis and several others pled guilty, Willis pleading to conspiracy and five counts of distribution under 21 U.S.C. § 841. After trial the jury convicted Moretto, Elwell, and George Moran (whose appeal has been separately de-

cided) of conspiracy. In addition, Moretto was found guilty of witness intimidation, 18 U.S.C. § 1512, and Elwell of three counts of distribution, 21 U.S.C. § 841, and one of filing a false tax return. 26 U.S.C. § 7206.

The critical testimony at trial, except in the case of Moran, came primarily from Mark Polito, whose account was bolstered by police testimony and tape recordings. He testified that during the spring of 1988 he purchased ounce quantities of cocaine every week or two from Moretto. Because Moretto was scheduled to report to prison for a prior offense, Moretto—according to Polito's testimony—arranged a meeting between Polito and Willis, "the man he [Moretto] got his stuff from." At the meeting Willis agreed to introduce Polito to the distributor who managed Willis' "northern territory." A few days later Willis introduced Polito to Elwell and for the next few months Elwell supplied Polito with cocaine at the same price previously charged by Moretto.

Polito eventually fell behind in payments and, under pressure for payment exerted by Willis and Elwell, Polito began to cooperate secretly with law enforcement authorities. Now buying drugs with government money, Polito recorded conversations with Elwell and, on one occasion, brought a DEA undercover agent to a meeting with Elwell. During a later sale, Elwell told Polito that Willis wanted Polito to "remember" Moretto at Christmas, Moretto then being in prison. This reminder was repeated at a later meeting. Eventually Elwell became suspicious of Polito, ceased to deal with him and in 1989 Willis began to supply Polito directly. The last reported transaction occurred on February 16, 1989, when Polito paid Willis part of the money still owed to Elwell for prior purchases.

Moretto was released from prison on June 5, 1990. On June 11 and 12, 1990, three telephone calls occurred between Moretto and Polito, which Polito secretly recorded. Those calls, described below, formed the basis of the obstruction count against Moretto. Nothing pertinent to the charges was proved at trial to have occurred after June 12. In August 1990, the indictment was returned.

Following Willis' guilty plea and the trial of Elwell, Moretto and Moran, the defendants were sentenced. Willis and Moretto were found to be career offenders under the Sentencing Guidelines and each was sentenced to 210 months in prison. Elwell was sentenced to 78 months. The present appeals followed.

## II.

■ Moretto's main argument on appeal is that the evidence of his adherence to the conspiracy charged in the indictment was too weak to permit a reasonable jury to convict. He further argues that, at most, the evidence showed several conspiracies rather than the single one charged in the indictment, and he asserts that this supposed variance between the conspiracy charged and any conspiracy proved was prejudicial. We need not treat the prejudice argument separately because we conclude that the evidence adequately, if not amply, supported the government's claim of a single conspiracy involving Willis and others in which Moretto participated.

Moretto does not dispute that Willis directed a cocaine ring but, carving his own role into phases, he seeks to distance himself from the ring. Moretto's repeated sales of cocaine to Polito in the first part of 1988, which were amply proved, are claimed by Moretto to fall outside the ambit of the Willis ring.[1] Moretto then ar-

---

**1.** Moretto places stress upon a statement of the prosecutor, made to the judge in a pretrial conference, that the conspiracy charged by the government began in March 1988 when Moretto introduced Polito to Willis. Although the prosecutor did make such a statement—seemingly a slip of the tongue—the government's actual theory of the conspiracy was that it reached back to embrace Moretto's earlier sales, as the prose-

cutor made fairly clear at the bottom of the same transcript page and even clearer two pages later. There, responding to the judge's question ("The Government's theory is that there was some association between them [Moretto and Willis] prior to that introduction [of Polito to Willis]"), the prosecutor stated, "Yes, from Moretto up the ladder...."

gues that he could not have participated in the ring from March 1988 to June 1990 since he was in prison. As to the conversations with Polito on June 11–12, 1990, Moretto says that—even assuming them to be obstructive—they occurred well after the last proved transaction of Willis and Polito on February 16, 1989, and therefore occurred after the conspiracy.

The jury was entitled to link these supposedly separate events together with certain connecting facts that Moretto omits. The drug sales he made to Polito during early 1988 were, the jury could have concluded, based on supplies furnished by Willis; Moretto, according to Polito's testimony, said that Willis was "the man he got his stuff from." The jury could also have thought that the Willis–Moretto relationship was a continuing one since, when Moretto was forced to report to prison, he introduced Willis as a substitute supplier. Willis then arranged for further sales to Polito at Moretto's original price. One act, after all, can take color from others, and drawing such inferences is the jury's task.

During Moretto's first year in prison there is ample evidence of continued sales by Elwell and Willis to Polito. Moretto, although in prison, was not entirely out of the picture: Elwell twice told Polito that Willis wanted him to "remember" or not forget Moretto at Christmas. While various inferences can be drawn from these reminders, the jury could have believed that they reinforced Moretto's connection with the ongoing conspiracy (even assuming, as the government seems to do in its brief, that Moretto was not a participant while imprisoned).[2] Specifically, the evidence increases the likelihood, however slightly, that Moretto was once a conspirator and might rejoin the conspiracy after prison.

The jury could then have concluded that, in making the telephone calls to Polito in June 1990, Moretto did rejoin the conspiracy. It is true that the time gap between the last proved Willis ring transaction in February 1989 and the calls in June 1990 is substantial. But the jury was not obliged to believe that a well organized drug ring, which enjoyed a "northern territory" and remembered a former associate at Christmas, had suddenly expired. When this same former foot soldier is discovered in June 1990 threatening a witness, who is believed likely to testify to the ring's activities, the jury might well have concluded that the conspiracy was ongoing and the soldier had just reenlisted.

*Grunewald v. United States*, 353 U.S. 391, 77 S.Ct. 963, 1 L.Ed.2d 931 (1957), heavily relied on by Moretto, does not forbid this inference. It dealt with entirely different facts—specifically, a conspiracy that had achieved its single objective well before the acts of concealment that were claimed to extend it for purposes of the statute of limitations.[3] Perhaps more in point is the statement in *United States v. Mayes*, 512 F.2d 637, 642 (6th Cir.), *cert. denied*, 422 U.S. 1008, 95 S.Ct. 2629, 45 L.Ed.2d 670 (1975) that "[w]here a conspiracy contemplates a continuity of purpose and a continued performance of acts, it is presumed to exist until there has been an affirmative showing that it has terminated...." In all events, the jury in this case was certainly entitled to infer from all of the circumstances—apparent size of the drug ring, its duration, Moretto's threats, and the threats' references to others—that the ring continued and Moretto rejoined it.

■ Separately, Moretto claims that the evidence did not support the jury's guilty verdict against him on the charge of witness intimidation under 18 U.S.C.

---

**2.** The government's brief in fact points to evidence that Moretto while in prison telephoned Polito's mother to threaten Polito for failing to pay his drug-purchasing debts. That evidence may not have been admissible because of its hearsay character—apparently the initial source of the evidence was Polito's mother, who did not testify. However, this evidence is not challenged on this appeal, and the remaining evidence against Moretto is adequate even if this

evidence, largely embodied in a single sentence of Polito's testimony, is ignored.

**3.** Similarly, in *United States v. Serrano*, 870 F.2d 1 (1st Cir.1989), statements sought to be introduced under the co-conspirator exception to the hearsay rule occurred after the fraudulent scheme had "collapsed."

§ 1512(b). That statute in pertinent part forbids any act of "intimidation" done with intent to induce anyone to "withhold testimony" from a grand jury or other official proceeding. The three telephone conversations in this case, recorded by Polito and played to the jury, are replete with statements by Moretto that the jury could reasonably have found to be intimidating in both nature and intent. A brief sampling of Moretto's statements, omitting some rejoinders by Polito, conveys their flavor:

> "I just have a message.... You have one chance to hear this and then its gonna be somtin' that you never want to hear and it's like a hairline fracture away from it. People knew what's going on."

> "Mark, we got friends all over the place, right? DEA, state troopers, everything.... [Y]ou don't seem to understand that everybody knows that you went and talked [to law enforcement agents].... I got to call these people back.... [T]hey just want some assurance that nobody's going to no Grand Jury...."

The heart of Moretto's appeal on this count is that during the first of the conversations on June 12, Polito asked Moretto if Moretto was threatening him and Moretto responded: "No, I'm not. I am not. I'm relaying indirect messages. I'm not threatening anybody. I'm—I would never hurt nobody. I'm not that kind of person." The jury could reasonably view this statement, lodged among many veiled threats, as a boilerplate disclaimer, coupled with the intimation that others ("I got to call these people back") would inflict the harm if Moretto's warning were ignored. If anything, the statement enhances the sinister character of the conversation.[4]

### III.

Willis, Elwell and Moretto each appeals his sentence. We consider their respective claims in that order.

*Willis.* Willis was sentenced as a career offender under U.S.S.G. § 4B1.1. That provision provides that a defendant is placed in the highest criminal history category and that specified minimum offense levels apply, if three conditions are met: first, the defendant must be at least 18 years old at the time of the instant offense; second, the offense must be a felony that is either a crime of violence or a drug offense; and third, the defendant must have "two prior felony convictions" for such offenses. It is undisputed that Willis meets the age condition, that the instant conviction is a drug offense and that he had five prior convictions, one state and four federal, for five bank robberies committed on different dates during a brief period in 1968.

■ Willis argued unsuccessfully at sentencing that the prior bank robberies should be treated as a single felony because the definitions provision of U.S.S.G. § 4B (§ 4B1.2(3)) provides in part that " 'two prior felony convictions' means ... [that the convictions were for a crime of violence or drug offense and that] at least two of the ... convictions are counted separately under the provisions of § 4A1.1(a), (b), or (c)." This latter provision, designed to determine the number and length of "prior sentence[s]" in order to compute a defendant's criminal history category under U.S.S.G. § 4A, in turn provides in a related definition that "[p]rior sentences imposed *in related cases* are to be treated as one sentence for purposes of § 4A1.1(a), (b) and (c)." U.S.S.G. § 4A1.2(a)(2) (emphasis added). The commentary to that section, *id.,* app. note 3, pertinently provides:

> [P]rior sentences are considered related only if they resulted from offenses that (1) occurred on the same occasion, (2) were part of a common scheme or plan, or (3) were consolidated for trial or sentencing.

Based on this language Willis argued at sentencing that his five bank robberies

---

**4.** Moretto's brief adopts by cross-reference Moran's argument that the trial judge gave a supplementary instruction that invited the jury to ignore the conspiracy charged in the indictment and convict of a different conspiracy. That argument is considered and rejected in our separate opinion in *Moran.*

were part of a common plan to rob banks and, in any event, that the sentences imposed—although not formally in consolidated cases—were concurrent sentences, part of the same bargain, and thus in "constructively" consolidated cases. Willis further requested that, if his proffer of these facts was not accepted, he be afforded an eviden-. tiary hearing and opportunity for fellow bank robbers to testify to their common plan and for a former attorney to show that the sentences were concurrent and part of the same plea bargain. The district court declined to hold an evidentiary hearing and concluded that the bank robbery convictions were separate crimes.

At first blush, it might seem unlikely that the Sentencing Commission intended a defendant to escape career offender status, in the teeth of two prior convictions for different bank robberies at different times and places, simply because those prior robberies were assertedly linked by a further felony, namely, an overarching conspiracy to rob banks that could literally be called a "common scheme or plan." Of course, two crimes might be so closely related—for example, an assault committed in the course. of a bank robbery—that it would disserve the plain purpose of a "repeat offender" statute to treat convictions for each as two prior convictions. But five separate bank robberies, committed with the opportunity to pause and reflect between them and memorialized by convictions, are surely what Congress had in mind as identifying a career offender. 28 U.S.C. § 994(h). One might therefore doubt, at least initially, whether the Commission was aware that the contrary result would follow from its commentary language whenever the bank robberies were part of a common plan.

If we were satisfied that the outcome departed from Commission intent, we might disregard the literal language of the commentary and treat as a single conviction only those convictions so closely related in time and function that separate treat-

ment would disserve the purpose of the career offender provision. Yet a broader perspective suggests that the Commission, in defining related convictions, did mean to adopt binding "rules of thumb," such as this one, as well as the even more mechanical rule that convictions for entirely separate crimes should be treated as one if they happen to be consolidated for trial or sentence. U.S.S.G. § 4A1.2(a)(2). In fact, the Commission in the same paragraph recognized that these rules of thumb could understate criminal history, and it said that the remedy in such cases was for the sentencing judge to employ an upward departure. *Id.*[5]

To conclude that the Commission intended the apparent result of its literal language does not resolve the matter since we might still decide that a rule of thumb that produces such a result is unfaithful to the guideline and to the career offender statute that lies behind it. But Congress in 28 U.S.C. § 994(h) authorized *the Commission* to develop guidelines to assure that career offenders receive high sentences; and we are loath to hold that the mechanism developed by the Commission (and submitted to Congress) falls outside that authority, even if there is a Rube Goldberg aspect to the use of overbroad rules of thumb tempered by the power to depart. The Second Circuit has treated the "common scheme or plan" language as binding, while eloquently urging the Commission to reexamine its "related cases" commentary. *United States v. Butler*, 970 F.2d 1017 (2d Cir.), *cert. denied*, ___ U.S. ___, 113 S.Ct. 480, 121 L.Ed.2d 386 (1992).

Once we decide that the "common scheme or plan" definition is both intentional and valid, it follows that the "common scheme or plan" language should be given its ordinary meaning. This same language is used in Fed.R.Crim.P. 8 (to determine joinder) and there is no doubt that in that context a conspiracy to rob banks would

---

**5.** In the commentary paragraph containing both the "single scheme or plan" and the "consolidated for trial or sentencing" provisions, the Commission continued: "The court should be aware that there may be instances in which this defini-

tion is overly broad and will result in [an inadequate] criminal history score.... In such circumstances, an upward departure may be warranted." U.S.S.G. § 4A1.2, app. note 3.

constitute a common scheme or plan. Willis offered to call fellow bank robbers to confirm that his robberies were part of the same conspiracy, and there is nothing implausible about his proffer, however odd it might seem to conduct this inquiry. Other circuits have required such evidentiary hearings which, not surprisingly, tend to produce findings that the multiple convictions were not part of a common scheme or plan. *E.g., United States v. Chartier,* 970 F.2d 1009 (2d Cir.1992).

 For the reasons indicated, we feel constrained to accept the guideline commentary, to conclude that the proffer could not be ignored, and thus to remand Willis' case for resentencing.[6] We do not, however, think that the district court is required to hold an evidentiary hearing if the court concludes that it would impose the same sentence even without the "career offender" label. The guideline commentary itself asserts that the rule of thumb here invoked by Willis is overinclusive and invites judges to depart upward where the rule of thumb operates to understate criminal history. Accordingly, the requirements for departure are satisfied if the judge supportably concludes that—even assuming the truth of Willis' proffer—five prior bank robberies, united by a conspiracy to rob banks, makes Willis deserving of a sentence similar to that he would receive if he were classified as a career offender. U.S.S.G. § 5K2.0.

 Whether or not the outcome proves to be the same for Willis, it is important for future cases that the integrity of the guideline regime be preserved. Under our reading of the guideline commentary, the district court may not classify

Willis as a career offender, assuming the truth of his proffer proposing to show a common scheme or plan; but we repeat (without prejudging the facts of this case) that the district court does have authority to depart upward, subject to appellate review. 18 U.S.C. § 3742(e)(3). The net effect is to increase the range of discretion of the district judge in these situations, which may be just what the Commission intended. As we have noted, an evidentiary hearing is not automatically required in cases like this one—not because the judge can "find" no common scheme or plan in the face of a proffer like this one and without a hearing, but rather because the judge may depart rather readily even if such a scheme or plan is assumed.[7]

Although Willis' case is to be remanded, we consider his other claims of error, both for the guidance of the district court and to reduce the need for further appeals. Specifically, Willis argues that he was wrongly denied an evidentiary hearing on two issues important to his sentencing, namely, the amount of cocaine for which he was responsible and his leadership status. We think the district court properly resolved these matters.

At the sentencing, the judge determined that Willis was responsible for 2.2 kilos, resulting in a base level of 28, U.S.S.G. §§ 2D1.1(a)(3), (c)(8), and was a "leader" warranting an upward adjustment. U.S.S.G. § 3B1.1. However, instead of adopting the resulting offense level, the judge ruled that Willis was a career offender, making him subject (in light of the maximum sentence to which he was liable) to a base level of 32. U.S.S.G. § 4B1.1 The court reduced this figure by 2 levels

---

**6.** The government says that the district court here "found" that there was no common scheme or plan and it says correctly that there is no automatic requirement of an evidentiary hearing for every contested issue. But in this case, Willis' proffer is not implausible on its face and there was apparently no other evidence about the bank robberies. As we read the transcript, the district court's "finding" actually derived from a narrowing interpretation of the guideline language.

**7.** We reject Willis' further argument that the bank robbery convictions, even though not for-

mally consolidated, should be deemed "constructively" consolidated because of the alleged plea bargain and concurrent sentences. The fact is that the cases were not consolidated. Whatever anomalies result from the accident of consolidation *vel non,* the situation is not going to be improved by treating unconsolidated cases as "constructively" consolidated, thereby broadening beyond its language an already overbroad rule of thumb. *See United States v. Rivers,* 929 F.2d 136 (4th Cir.), *cert. denied,* —— U.S. ——, 112 S.Ct. 431, 116 L.Ed.2d 451 (1991).

for acceptance of responsibility. The court then sentenced Willis at the top of the range provided by the sentencing table for a criminal with an offense level of 30 and a criminal history category of VI (which is automatic under U.S.S.G. § 4B1.1 for a career offender).

■ In finding Willis to be a leader and computing the amount of cocaine, the judge relied upon information adduced at the trial of Willis' co-defendants and on other government tape recordings not introduced at the trial but made available for the sentencing. On appeal Willis insists that he was entitled to an evidentiary hearing on the amount of cocaine. Neither the amount of cocaine nor the leadership finding affected the guideline range adopted by the district court since the career offender guideline superseded the "otherwise applicable offense level." U.S.S.G. § 4B1.1. Nevertheless, because the leadership role of Willis and the amounts of cocaine handled by his ring might well be pertinent to the district court's sentencing decision on remand, we address Willis' objections.

The law concerning the need for evidentiary hearings has been left primarily to development through individual decisions, which themselves reflect the tension between two attitudes: the history of almost unreviewable trial judge discretion in sentencing and the present specificity of the guidelines. *See* U.S.S.G. § 6A1.3. Here, however, there is no need for any lengthy discourse on sentencing hearings. A prima facie case existed, based on the presentence report and the evidence adduced at the co-defendants' trial, to regard Willis as playing a leading role in a ring dealing in substantial quantities of cocaine. At no point did Willis ever specify or proffer evidence that would be adduced in an evidentiary hearing to negate the amounts or Willis' role as leader. Under these circumstances, it is patent that no hearing was required. *United States v. Shattuck*, 961 F.2d 1012, 1015 (1st Cir.1992).

Lastly, Willis argues that because the prior convictions were used to trigger the career offender guideline, the government had to file a notice specifying the prior convictions before Willis' guilty plea in this case. 21 U.S.C. § 851 (prior notice is a condition of "increased punishment"). Willis' argument that section 851 applies to guideline increases, as well as statutory maximums, was rejected by this court in *United States v. Sanchez*, 917 F.2d 607, 616 (1st Cir.), *cert. denied*, — U.S. —, 111 S.Ct. 1625, 113 L.Ed.2d 722 (1991). We decline the invitation to reexamine that decision.

*Elwell.* Elwell was convicted of conspiracy, two distribution counts, and wilfully filing a false tax return, and he was sentenced to 78 months imprisonment. The sentence was the minimum allowed under the guideline range in light of the finding that he had distributed at least 500 grams. U.S.S.G. §§ 2D1.1(a)(3), (c)(3).

■ Elwell first contests the finding that he did distribute at least 500 grams. He admits the distribution to Polito of about 3 ounces (approximately 84 grams) for which he was convicted; indeed, Elwell admitted at sentencing that he had sold more to Polito without specifying a number. At trial Polito testified that, apart from the 3 ounces, Elwell had delivered "18, maybe 20" ounces of cocaine to Polito during the summer of 1988. The judge accepted this evidence despite Elwell's denial at the sentencing hearing that he had sold so large a quantity. Even the low-end figure of 18 ounces is 504 grams, exceeding the guideline minimum of 500 grams.

■ The critical facts by which a guideline range is fixed must be proved by a preponderance of the evidence, *e.g.*, *United States v. Blanco*, 888 F.2d 907, 909 (1st Cir.1989). While inviting us to raise or at least stiffen this standard, Elwell's main argument is that Polito's estimate was too casual to support the drastic increase in sentence that results for distributing 18 rather than 3 ounces. He stresses the fact that Polito was himself a user during this period and admitted to hazy recollections or mistakes in other testimony. Combining these arguments, he argues on appeal that the judge's determination was clearly erroneous, the standard properly applied on

review. *United States v. Aymelek*, 926 F.2d 64, 69 (1st Cir.1991).

■ We disagree. The district court, which heard Polito's testimony at trial and Elwell's testimony at the sentencing hearing, was entitled to choose between them. The time period over which Elwell supplied Polito and the size of Polito's purchases were also consistent with the 18–20 ounce figure. Against this backdrop and in light of the standard of review, we find no error. This conclusion also disposes of Elwell's claim that the larger ounce figure was wrongly used in determining the amount of unreported income in sentencing under the tax count.

■ Elwell objects lastly to the special condition of supervised release that requires him to submit to random drug testing, as well as drug and alcohol treatment, as directed by the Probation Service. Elwell objects that his use of drugs (cocaine and previously amphetamines) lay 5 years or more in the past, that nothing else supports this condition, and that supervised release conditions should "involve[ ] no greater deprivation of liberty than necessary...." 18 U.S.C. § 3583(d)(2). We believe that the drug testing and treatment requirement—if deemed necessary by the Probation Service—lay well within the district court's discretion, given Elwell's past use and past dealing in drugs. As to alcohol, the failure of Elwell to raise this objection at sentencing or by post-trial motion makes it impossible to assess the district court's reasons for adding in this condition and, in our view, this failure waived the objection.

*Moretto.* Moretto's sentence was based on the district court's finding that he should be treated as a career offender. His record showed two state court convictions for assault and related conduct in October 1987 and February 1990 respectively and a drug conviction for possession with intent to distribute in March 1988. In the district court, Moretto argued that the assault convictions were misdemeanors under state law, but the trial judge found

them to qualify as felonies for guideline purposes. See U.S.S.G. § 4B1.2, app. note 3 (prior felony conviction includes offense punishable by more than one year imprisonment even if not designated as a felony).

■ On appeal, Moretto asserts that the trial court relied on the two state assault charges to find two prior convictions. Moretto then argues that while the October 1987 conviction may be a "prior" felony conviction, the latter assault conviction in February 1990 occurred *after* the start in 1988 of the conspiracy for which he was convicted in this case. In reply, the government says that this argument is waived because not made below; that in any event the instant conspiracy continued after the February 1990 conviction, making it a prior conviction under the guidelines; and that the first assault conviction and the drug possession conviction both remain even if the second assault is disregarded.

■ Waivers are occasionally forgiven and the government's reliance on the March 1988 drug conviction could presumably be assailed on the same ground that Moretto now offers to exclude the February 1990 conviction from consideration, namely, that it occurred after the instant conspiracy began. But we think the ground is clearly wrong: continued participation in a conspiracy after a felony conviction renders that conviction a prior felony conviction. This is apparent from both the letter and intent of the guidelines, U.S.S.G. § 4B1.2(3) ("defendant committed the instant offense subsequent to sustaining at least two felony convictions...."), and thus there was no error in sentencing Moretto as a career offender.

The judgments are *affirmed* except as to Willis whose case is *remanded* for resentencing in accordance with this opinion.