# United States Court of Appeals
## For the First Circuit

---

No. 12-1990

UNITED STATES,

Appellee,

v.

NICOLE MARTIN,

Defendant, Appellant.

---

APPEAL FROM THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF MAINE

[Hon. John A. Woodcock, Jr., U.S. District Judge]

---

Before

Torruella, Dyk,[*] and Thompson,
Circuit Judges.

---

James A. Clifford, with whom Law Office of James Clifford, LLC
was on brief, for appellant.
Renée M. Bunker, Assistant United States Attorney, with whom
Richard W. Murphy, Acting United States Attorney, was on brief, for
appellee.

---

April 23, 2014

---

[*] Of the Federal Circuit, sitting by designation.

**THOMPSON, Circuit Judge**.  Following a tip from a confidential informant, law enforcement officers pulled over the vehicle of Nicole Martin on March 28, 2007.  A search turned up heroin, cocaine, and oxycodone.  Martin was arrested, indicted, and ultimately pled guilty to possession with intent to distribute.  At sentencing, relying on two prior felony convictions that Martin had, the judge treated her as a career offender and handed down a 108-month sentence.  Martin appeals that sentence.  In a nutshell, she disputes her career offender status because, according to Martin, her two prior convictions should have been treated as one for sentencing purposes.  After a painstaking review of the record and the applicable law, we affirm her sentence.

## I. BACKGROUND[1]

The crime that led to this appeal occurred in March 2007 but before we get into the details of what happened, we must travel further back to when the convictions, upon which the judge's career offender determination rested, occurred.  These convictions stemmed from two controlled purchase transactions by undercover Maine Drug Enforcement Agency ("MDEA") agents who were investigating a heroin wave that was flooding Hancock County, Maine.[2]  The first purchase

---

[1] Because there was no trial, we draw the facts from the change of plea colloquy, the presentence reports, and the transcript of the sentencing hearing.  See United States v. Colón-Solís, 354 F.3d 101, 102 (1st Cir. 2004).

[2] Any city, town, or county referred to in this opinion is located in Maine.

was on September 27, 2001 in Bass Harbor ("the September 2001 offense"), and the second was two weeks later on October 11, 2001 in Bar Harbor ("the October 2001 offense"). A brief summary of the transactions and subsequent convictions sheds light on how the present controversy emerged.

## A. The 2001 Offenses

On September 27, 2001, MDEA Special Agent Ruth Duquette and a confidential informant met Martin at her home in Trenton. Duquette, Martin, and the informant then drove to Martin's dealer's house in Bass Harbor to purchase some heroin. Her dealer, Chris Richardson, was not home when they arrived. After paging Richardson, the trio met up with him at a Texaco station. Richardson arrived at the Texaco station, accompanied by another man. Richardson did not have any heroin on him, but could get some from the guy who was with him. Special Agent Duquette handed Richardson $400 for a bundle -- i.e., ten bags of heroin -- and Richardson promised to meet back up with them at his house, with the heroin, by 6:00 p.m. Duquette, Martin, and the confidential informant then proceeded to Richardson's house to wait for him. Meanwhile, Richardson made a heroin run to his supplier's house in Southwest Harbor. He returned unaccompanied to his home, with the full bundle. Special Agent Duquette received nine bags of heroin and Martin kept one for herself as commission.

Two weeks later, on October 11, 2001, a second controlled purchase of heroin went down. This one took place near the clothing store in Bar Harbor where Martin worked. Special Agent Duquette waited until Martin's shift was over at 9:00 p.m. to approach her. When she asked Martin for assistance getting a hold of more heroin, Martin revealed she did not have anything at that time, but could help her out in an hour. Special Agent Duquette returned by 9:52 p.m. Around 10:00 p.m., Martin met with a man in a car registered to Cameron Brown.[3] After approximately twenty minutes, Martin returned to Special Agent Duquette's car and got in. Wary of police presence that night, Martin instructed Duquette to drive down the street. Once there, Martin got out of the car, and again, spoke with people in the Brown car. After Martin returned to Special Agent Duquette's vehicle, the pair drove to a nearby business, and pulled up on the side of it. Duquette handed Martin $250: $200 for the heroin and $50 as commission. Martin got out of the vehicle, met with someone from the Brown car, and came back with four "double bags" of heroin.

**B. Martin is Convicted for the 2001 Offenses**

On February 5, 2002, a state grand jury returned a two-count indictment charging Martin with unlawful trafficking in scheduled drugs. The indictment charged Martin with trafficking

---

[3] The registration information was learned when Duquette transmitted the car's license plate number to an MDEA surveillance team in place.

heroin in connection with both the September 2001 offense and the October 2001 offense.  Martin pleaded guilty to trafficking heroin on October 11, 2001, and as a result, the charge for the September 2001 offense was dismissed.

Meanwhile federal proceedings were underway as well.  On April 9, 2002, a federal grand jury in Bangor returned a one-count indictment charging Martin with possession with the intent to distribute heroin on September 27, 2001 -- i.e., for the September 2001 offense.  Martin was arrested and charged by federal authorities.  Martin pleaded guilty.

On September 10, 2002, Martin was sentenced for the September 2001 offense by a federal judge (who was aware of the pending state charges) to a year and a day in prison, and three years' supervised release.  The next day, on September 11, 2002, Martin was sentenced in state court for the October 2001 offense to a term of four years' imprisonment, all but one year of which was suspended, and three years' probation.

With this backdrop in place, we fast forward a few years to the circumstances that gave rise to Martin's most recent conviction, from which this appeal stems.

## C. The 2007 Offense

On March 28, 2007, MDEA agents received a tip from a confidential informant who had recently bought two 80-milligram oxycodone tablets from Martin.  According to the confidential

informant, Martin would be driving from Portland to Bangor with a drug delivery. Acting on this lead, MDEA agents spotted her vehicle heading north on Interstate 95 and kept it under close surveillance. Bangor police officers ultimately stopped Martin as she exited the interstate.

By the time MDEA agents arrived on the scene, Martin was already outside her vehicle speaking with a police officer. MDEA Special Agent Brad Johnston, who knew Martin from prior encounters, approached her and asked if she was on federal supervised release. Martin acknowledged she was. Special Agent Johnston then asked her if there were any drugs in the car. Martin responded affirmatively, and directed him to her purse on the front passenger seat. The search of Martin's purse revealed 21 bags of heroin, 4.4 grams of cocaine, and 25 and one-half 40-milligram oxycodone tablets. According to Martin, she had gotten the drugs from a dealer in Portland, and had been selling for approximately a month: cocaine for $80 a gram, heroin for $15 a bag, and oxycodone tablets for $40 each.

Martin was charged by a federal grand jury in a three-count indictment with possession with the intent to distribute cocaine, oxycodone, and heroin in violation of 21 U.S.C. § 841(a)(1). Martin entered into a plea agreement with the government and, on July 5, 2007, Martin pleaded guilty to all counts of the indictment and admitted to violating the conditions

of her supervised release.  All that remained was for Martin to be sentenced.

### D. Sentencing

The primary sentencing-related issue was whether Martin should be treated as a career offender in light of her two previous felony convictions (stemming from the September 2001 offense and the October 2001 offense).  For Martin, the difference between career offender status and non-career offender status was significant: if she did not qualify as a career offender, the applicable sentencing range was 27 to 33 months, but if she did, it was 188 to 235 months.  The United States Probation Office's final presentence report recommended that Martin be treated as a career offender.  Martin disagreed.

The dispute centered around § 4B1.1 of the 2006 United States Sentencing Guidelines Manual (the "Guidelines").  Greater detail on the applicable law will come later, but for now it suffices to note that under § 4B1.1, a defendant should be treated as a career offender if (among other things not relevant to this appeal) she has at least two prior felony convictions of a controlled substance offense.  See U.S.S.G. § 4B1.1(a).[4]

Martin, in her sentencing memoranda, argued that she did not satisfy this requirement.  In short, she claimed that her prior

---

[4] Martin was sentenced under the 2006 version of the Guidelines.  Citations to the Guidelines are to the 2006 version unless otherwise noted.

felony convictions for the September 2001 offense and the October 2001 offense should not be counted separately under the Guidelines, but rather as one. She argued that the two offenses were part of "a single common scheme or plan," i.e., part of the MDEA's overarching drug investigation. Martin also alleged that the two convictions were consolidated for sentencing purposes, pointing out that the sentences were imposed within a day of each other and ran concurrently. The government pushed for career offender status. It noted in its sentencing memorandum that Martin's conduct charged in the federal and state cases had occurred on different occasions, in two different towns, and the heroin had been provided to Martin by two different sources.

An evidentiary hearing was held on November 20, 2008, to probe the issue. Prior to the hearing, the district court judge had reviewed the sentencing transcripts of both the federal sentencing hearing for the September 2001 offense and the state sentencing hearing for the October 2001 offense. During the hearing, the court heard testimony from Special Agent James Carr, an MDEA agent involved in the Hancock County investigation that led to Martin's prior convictions. The two-count state court indictment and the one-count federal court indictment were also introduced into evidence. Equipped with all of this evidence, along with documentation previously submitted by the parties, such as the MDEA reports for the two controlled purchase transactions

between Martin and Special Agent Duquette, the district court took the issue of Martin's career offender status under advisement.

## E. The District Court's Opinion

On December 3, 2008, the district court issued its decision. It noted that applying the concept of a common scheme or plan to a drug addict like Martin was "admittedly problematic" because, in essence, each and every day Martin was engaged in some type of scheme or plan to procure heroin in the confined geographic area where she lived (Mount Desert Island). Nonetheless, the court did not think the underlying offenses were part of a single common scheme or plan.[5] Looking for some kind of connective tissue between the two offenses, the court found that Martin had not anticipated or planned the October 2001 offense at the time of the September 2001 offense, and therefore no common scheme or plan existed. Thus, Martin's criminal history included two prior felony convictions of a controlled substance offense, which warranted career offender designation pursuant to § 4B1.1 of the Guidelines. The court sentenced her to imprisonment for a term of 108 months

---

[5] The court also rejected Martin's argument that the September 2001 offense and the October 2001 offense had been consolidated for sentencing. The court found no formal order or indicia of consolidation, explaining, "the [federal and state] charges were initiated in separate courts by separate charging instruments through separate grand juries and brought before separate judges on separate days with separate docket numbers and resulted in separate judgments and commitments." Martin does not dispute this finding and has abandoned her sentencing consolidation argument on appeal.

(in other words, nine years).  Martin timely appealed her sentence;
her sole challenge is to her classification as a career offender.

## II. STANDARD OF REVIEW

A district court's interpretation of a sentencing
guideline's meaning and scope calls for de novo review.  United
States v. Carrero-Hernández, 643 F.3d 344, 349 (1st Cir. 2011).
The determination of whether a prior conviction qualifies as a
predicate offense for purposes of the career offender guidelines is
a question of law we review de novo.  United States v. Tavares, 705
F.3d 4, 32 (1st Cir. 2013).  As for the court's application of the
Guidelines to the facts, we give that due deference, United States
v. Greig, 717 F.3d 212, 217 (1st Cir. 2013), and will not find
clear error as "long as the district court's decision is based on
reasonable inferences drawn from adequately supported facts,"
United States v. Santos, 357 F.3d 136, 142 (1st Cir. 2004).

A district court's findings of fact are also reviewed
only for clear error.  Carrero-Hernández, 643 F.3d at 349.  Under
a clear error standard, a district court's plausible interpretation
of the facts cannot be rejected just because the record might
sustain a conflicting interpretation.  In re O'Donnell, 728 F.3d
41, 45 (1st Cir. 2013).  "[T]o find clear error, a finding must hit
us as more than probably wrong -- it must prompt a strong,
unyielding belief, based on the whole of the record, that the judge

made a mistake."  Id. (citations omitted) (internal quotation marks omitted).

### III. DISCUSSION

### A. Primer on Career Offender Guidelines

Before we delve into the merits of Martin's claimed errors, we pause to say a little more on the relevant law. According to § 4B1.1, a defendant sentenced in federal court should be treated as a career offender if: (1) the defendant was at least eighteen when she committed the instant offense; (2) the instant offense is either a crime of violence or a controlled substance offense; and (3) she "has at least two prior felony convictions of either a crime of violence or a controlled substance offense." U.S.S.G. § 4B1.1(a).[6]

To have two prior felony convictions for purposes of career offender status, not only must a defendant have at least two felony convictions of either a crime of violence or a controlled substance offense under her belt, but the sentences for these felony convictions must be such as to be counted separately under the provisions of § 4A1.1(a), (b), or (c).  U.S.S.G. § 4B1.2(c). "Prior sentences imposed in unrelated cases are to be counted

_____

[6] Prongs one and two are not at issue in this case; there is no dispute that Martin's March 28, 2007 offense constituted a controlled substance felony offense or that she was eighteen when she committed it.  As for prong three, there is also no disagreement that her prior felony convictions are convictions for controlled substance offenses.  The only issue is whether they should effectively be considered one conviction.

-11-

separately," while "[p]rior sentences imposed in related cases are to be treated as one sentence for purposes of § 4A1.1(a), (b), and (c)."  Id. § 4A1.2(a)(2).

Although seemingly straightforward, what counts as a related case versus an unrelated case can get tricky.  According to § 4A1.2's accompanying commentary, for prior sentences to be related -- and thus treated as one for purposes of career offender status -- the underlying offenses must have either "occurred on the same occasion," been "part of a single common scheme or plan," or been "consolidated for trial or sentencing."  Id. § 4A1.2, cmt. n.3.[7]  As we referenced, the "part of a single common scheme or plan" conception is what is germane to this case.  With the relevant law sketched, we proceed to our analysis.

**B. The Standard for a Single Common Scheme or Plan**

As we alluded to above, when deciding whether Martin qualified for career offender status, the district court required that, in order for multiple drug transactions to constitute a single common scheme or plan, the transactions had to have been agreed to (or at least planned, discussed or contemplated) by the defendant at the time of the first transaction.  It first noted this court's directive that the phrase "common scheme or plan" be

---

[7] The Guidelines have been subsequently amended to require that multiple prior sentences be counted separately unless they "resulted from offenses contained in the same charging instrument," or "were imposed on the same day."  U.S.S.G. § 4A1.2(a)(2) (2013).

given its "ordinary meaning."  For this proposition, the court cited United States v. Godin, 489 F.3d 431 (1st Cir. 2007) (vacated on reh'g on other grounds by 522 F.3d 133 (1st Cir. 2008)) and United States v. Elwell, 984 F.2d 1289 (1st Cir. 1993).  Godin, the district court continued, stood for the proposition that a scheme or plan implies the existence of "some kind of connective tissue," i.e., an initial plan involving multiple acts or steps taken to a single end.  The court expanded on this concept, noting that the Seventh Circuit, in United States v. Marrero, 299 F.3d 653, 657 (7th Cir. 2002), "described the test as being 'whether the second crime was anticipated and planned when the original crime was planned or committed.'"

Martin argues that the standard employed by the district court for evaluating whether a common scheme or plan exists is more stringent than the standard actually set by this Court for doing so.  Specifically -- despite the fact that the district court relied on both cases -- Martin insists the court's standard runs afoul of our directive in Elwell and Godin to give the phrase "part of a single common scheme or plan" its "ordinary meaning." Martin's argument is hard to follow but, as best we can tell, she claims that the phrase's ordinary meaning calls for a focus on both the factual commonalities between the offenses (e.g., temporal and geographical proximity, the common criminal investigation, the modus operandi) and the intentions of all the parties involved in

-13-

the transactions, including the agents.  Martin alleges the district court deviated from this supposed ordinary meaning by focusing too narrowly on Martin's intent[8] alone, as well as her "character or habits."[9]  Because we are considering the district court's interpretation of a sentencing guideline's meaning, our review is de novo.  See Carrero-Hernández, 643 F.3d at 349.  We start by taking a look at the cases cited by Martin, and relied on by the district court.

    Elwell involved a defendant, Hobart Willis, who pleaded guilty to conspiracy to distribute cocaine under 21 U.S.C. § 846, as well as distribution under 21 U.S.C. § 841.  984 F.2d at 1291.[10]

_____

    [8] Martin vacillates in her brief, using the phrases "subjective intent" and "specific intent" interchangeably, even though the phrases denote different concepts.  It seems clear to us that Martin simply means to refer to her own intent, i.e., Martin claims the court honed in too much on her intentions alone.

    [9] It is not entirely clear what Martin means by "character or habits."  We suspect she is referring to the district court's mention of her addiction to illegal drugs.  Assuming this is the case, we can readily dispose of this argument.  The district court indeed mentioned Martin's addiction to heroin and her daily quest to secure the drug but the court did not focus on these things during its inquiry into whether the two predicate offenses were part of a single common scheme or plan.  The court, it appears, was simply commenting on how the common scheme or plan concept can be difficult to apply to habitual drug users who, in some instances, are constantly scheming to obtain more drugs.  A whole reading of the court's decision makes clear that Martin's addiction did not play a role in the court's ultimate determination that there was no agreement between Martin and Duquette that a second deal would follow.

    [10] Elwell discussed the appeals of three defendants: David Elwell, Richard Moretto, and Hobart Willis.  All three had been indicted, along with six other persons, for conspiring to

-14-

The district court sentenced him to 210 months' imprisonment under the career offender guidelines due to five prior felony convictions on his record for five bank robberies committed on different dates during a brief period of time in 1968.  Id. at 1292, 1294.  At sentencing, Willis had argued unsuccessfully that the prior bank robberies should be treated as a single felony conviction because, among other things, they "were part of a common plan to rob banks." Id. at 1294-95.  He requested an evidentiary hearing at which fellow bank robbers would testify as to this common plan, if his proffer of the facts was not accepted.  Id. at 1295.  The district court did not accept Willis's proffer, declined to hold an evidentiary hearing, concluded the bank robbery convictions were separate offenses, and sentenced Willis as a career offender.  Id.

On appeal, we found that the defendant's proffer that the five bank robberies were part of an overarching conspiracy was not implausible, held the district court could not simply ignore it, and remanded the case with specific instructions for re-sentencing. Id. at 1296.  Our discussion of "a single common scheme or plan" in Elwell was brief, given that the relevant issue on appeal was limited to whether the district court could disregard the defendant's proffer and deny his request for an evidentiary

distribute cocaine and other related offenses.  See Elwell, 984 F.2d at 1291.  Both Willis and Moretto had been sentenced as career offenders, but the issue of "a common scheme or plan" was only discussed in regards to Willis's appeal.  See id. at 1294-97.

-15-

hearing. However, we did indicate that "the 'common scheme or plan' language should be given its ordinary meaning." Id. at 1295. Pertinent to our current discussion, Elwell offers nothing more than an unremarkable reminder of the common adage of statutory construction to give words their ordinary meaning.

The second case Martin hangs her hat on is Godin, 489 F.3d at 431. In Godin, defendant Jennifer Godin pleaded guilty to obstructing commerce by robbery under 18 U.S.C. § 1951(a), and to using and carrying a firearm, including brandishing the weapon during and in relation to the robbery, under 18 U.S.C. § 924(c)(1)(A)(ii). 489 F.3d at 433. She was sentenced as a career offender to 262 months in prison because of two prior convictions for the burglaries of two different apartments in the same building. Id. at 434. The burglaries had been committed six days apart and were both motivated by a desire for revenge. Id. at 434-35, 436. In both instances, Godin "knew the victim, had some grievance, kicked in the apartment door and stole various items." Id. at 435. Godin argued that given these factual commonalities, both burglaries should be considered part of a common scheme or plan. Id. at 436. The district court disagreed. Id.

Taking up Godin's claims on appeal, we acknowledged that the concept of a single common scheme or plan is a "vague" one, which lacked a "formal test." Id. But a framework did not

-16-

completely elude us. We reiterated Elwell's dictate that "the 'ordinary meaning' of the phrase 'single common scheme or plan' should be used." Id. (citing Elwell, 984 F.2d at 1295). Doing so, we held that a "scheme or plan implies some kind of connective tissue like an initial plan encompassing multiple acts or a sequence of steps to a single end." Godin, 489 F.3d at 436 (citing United States v. Joy, 192 F.3d 761, 771 (7th Cir. 1999)). This meant (for Godin) that "burglaries of two different apartments committed by one actor several days apart need[ed] something more than resemblance of mode or motive even if that were relevant." Id. We concluded that the district court was correct in determining that, despite the factual commonalities, Godin's two burglaries were not part of a single common scheme or plan. Id. The relevant law sketched, we turn to Martin's contention that the district court employed a standard that did not comport with Elwell and Godin. Simply said, she is wrong.

Although Godin does not set a hardline standard to work with, it does provide us guidance. From Godin, we know that factual commonalities between offenses are not enough to support a contention that the offenses were part of a single common scheme or plan. After all, the offenses at issue in Godin -- two prior burglaries of different apartments in the same building -- were riddled with factual commonalities, including the same motive for

-17-

vengeance, yet we placed little weight on them. Rather, something more is needed. That is precisely what the district court required here.

Keeping in mind the "ordinary meaning" dictate, the district court looked for something over and above tangible similarities between the predicate crimes and it reasonably concluded that, to consider multiple drug transactions as part of a single common scheme or plan, "the series of transactions ha[d] to be agreed to at the outset." Accordingly, the district court focused its inquiry on "whether the second crime was anticipated and planned when the original crime was planned or committed." Indeed neither Elwell or Godin took precisely this same tack, but that is not dispositive. As we explained, determining what constitutes a common scheme or plan is an imprecise science at best. See Godin, 489 F.3d at 436. What is important is the existence of a so-called "connective tissue," such as "an initial plan encompassing multiple acts or a sequence of steps to a single end." Id. The district court, honing in on Martin's intent,[11] looked for a connective tissue -- that is, whether Martin had laid

_____

[11] Perhaps the district court could have been more clear about the fact that its inquiry was directed at whether Martin, as opposed to the MDEA agents, had anticipated or planned the October 2001 offense when the September 2001 offense was planned or committed. That it was not, however, is inconsequential. While not expressed in so many words, the single common scheme or plan the district court was looking for was that of the defendant's.

an initial plan to conduct multiple drug deals with Duquette or, at the very least, contemplated just such a thing happening. This approach makes sense and is consistent with both Elwell and Godin. Furthermore, some of our sister circuits have read the phrase "single common scheme or plan" precisely as the district court did here. See United States v. Joy, 192 F.3d 761, 771 (7th Cir. 1999)[12] (holding that "because the terms 'scheme' and 'plan' are words of intention, . . . crimes are part of a single common scheme or plan only if they were jointly planned or when one crime would normally entail the commission of the other"); United States v. Irons, 196 F.3d 634, 638 (6th Cir. 1999) (same); United States v. Robinson, 187 F.3d 516, 520 (5th Cir. 1999) (same); United States v. Chapnick, 963 F.2d 224, 227 n.5 (9th Cir. 1992) (same); see also United States v. Chartier, 970 F.2d 1009, 1016 (2d Cir. 1992) (finding that "the term 'single common scheme or plan' must have been intended to mean something more than simply a repeated pattern

---

[12] In Joy, the Seventh Circuit considered whether a theft conviction and a deceptive practices conviction were related under § 4A1.2(a)(2) as part of a single common scheme or plan. 192 F.3d at 770-72. The court held that it is for the defendant to show "he intended to commit both crimes from the outset or he intended to commit one crime which necessarily involved committing the other." Id. at 771. The fact that two crimes have the same modus operandi, are close in time, or are similar in nature does not mean these crimes are related as part of a single common scheme or plan. See id. According to the Seventh Circuit, the "test is one of singularity, not similarity." Id. Of note, Marrero, 299 F.3d at 656, the Seventh Circuit case relied on by the district court, cited Joy favorably.

of criminal conduct" and that the concept involves "subjective as well as objective elements").

In the end, Martin's argument that she should not be the spotlight of the district court's scrutiny gets her nowhere. The district court's focus on whether Martin planned or contemplated her second offense at the time of her first was not overly narrow as Martin suggests; rather it was in accord with our case law and law from other circuits as well. It was also appropriate for the court to center in solely on Martin's plans and designs. Indeed a dual focus on the intentions of Martin and the MDEA agents (as advocated for by Martin on appeal) makes little sense. The operative inquiry here is whether Martin's crimes should be counted as one or as two for purposes of her sentencing. The only person whose intentions are relevant to that inquiry is Martin. After employing the requisite de novo review, we conclude the district court applied a proper standard.

## C. Whether a Single Common Scheme or Plan Existed

Our determination as to the standard employed by the district court does not however bring our analysis to an end ; Martin has a back-up contention. She says that under any standard -- even the district court's purported "heightened" one -- the court erred in finding no common scheme or plan. Our assessment of Martin's claimed error is deferential. To the extent that she

disputes the district court's findings of fact, we review only for clear error.  See Carrero-Hernández, 643 F.3d at 349.  Similarly, we give due deference to the court's application of the Guidelines to the facts.  See Greig, 717 F.3d at 217.  We start by saying a little more about the district court's holding.

Relying on Elwell and Godin, the district court held that the September 2001 offense and the October 2001 offense were not part of a common scheme or plan because, notwithstanding the fact that both offenses stemmed from the same law enforcement investigation, "there was no agreement with Ms. Martin at the first deal that a second one would follow."  According to the district court, "to squeeze multiple drug transactions into a 'common scheme or plan,' the series of transactions has to be agreed to at the outset."  In Martin's case, it found the October 11th deal was a separate transaction, arranged through a different supplier, "which was not planned, discussed, or contemplated at the first transaction."

Martin's main quibble is with the court's factual finding that there was no agreement between her and Special Agent Duquette regarding a second transaction.  She claims the record evidence, in particular Special Agent Carr's[13] evidentiary hearing testimony and his MDEA report, establishes that there was in fact an arrangement

---

[13] To remind the reader, Special Agent Carr was an MDEA agent who was involved in the Hancock County investigation that led to Martin's 2001 convictions.

between her and Duquette at the time of the September 27th drug deal that a second transaction would follow. Martin points to the following testimony. On direct examination by defense counsel, Special Agent Carr was asked whether there was any contact between Martin and Special Agent Duquette after the September 27th purchase. Carr responded in the affirmative and, when asked to elaborate, he stated: "After the initial purchase from Ms. Martin on -- in the end of September, we had Agent Duquette place a phone call to Ms. Martin and arrangements to make -- to make another purchase." We fail to see how this testimony supports the notion that a second deal was discussed or contemplated, much less agreed to by Martin, before or during the commission of the September 2001 offense.

Carr's testimony explicitly states it was not until after the initial purchase that Special Agent Duquette was instructed to call Martin to arrange a second deal. Despite Special Agent Carr's unambiguous testimony, Martin thinks one can infer that a phone call was in fact made on or near September 27th. For support she points out that not only did a subsequent deal ultimately follow, but Duquette showed up right before Martin got off work on October 11th, which (according to Martin) implies that Duquette was aware of Martin's work schedule. Martin's hypothesis that the call happened on or about September 27th is certainly plausible but, unfortunately for her, there are equally plausible competing

-22-

inferences.  Perhaps Duquette did not call Martin until the morning of October 11th (or even a couple days before) at which time arrangements were made for Duquette to meet Martin at the end of her shift.  Or, also conceivable, is a scenario in which Duquette -- knowing Martin's work schedule based on information gathered by surveillance -- never called Martin and simply surprised her in person on the 11th.  There is no need to kick around any more possibilities.  A district court's plausible interpretation of the facts cannot be rejected on clear error review just because the record might sustain a conflicting interpretation.  See In re O'Donnell, 728 F.3d at 45.  Carr's testimony does not help Martin.

Special Agent Carr's MDEA report for the September 2001 offense, which Martin also draws our attention to, provides no better support.  She claims the MDEA report, which was written after the September heroin purchase but before the October one, is proof of an existing agreement.  Martin relies on the following language from the report: "Duquette . . . would be acting in an undercover capacity as a buyer of heroin and would be introduced to Martin for future drug transactions without the use of a [confidential informant]."  This also does nothing for Martin's cause.  It in no way establishes that Martin herself agreed to, planned, or considered a second drug transaction at the time of the first.  Rather what it does show is the MDEA's plan to try and engage with Martin in future heroin purchases.  What the district

court logically looked for was the defendant's intention to engage in additional crimes as part of a larger scheme or plan. The fact that Martin was targeted by a single law enforcement investigation is irrelevant to her intent to commit more than one offense with Duquette.[14]

Not only does the evidence cited by Martin (Carr's testimony and the MDEA report) fail to convince, but other evidence before the district court works against her. For one, there was Special Agent Duquette's report for the September 2001 offense. This very detailed two-page report chronicles the events that transpired on September 27, 2001, but does not mention, or even hint at, another transaction with Martin being in the works. Also in front of the district court was Special Agent Ralph Bridges's report regarding the October 2001 offense.[15] According to this report, Special Agent Duquette "was going to attempt to make

---

[14] There is somewhat contradictory evidence regarding the MDEA's plan going forward after September 27th. Carr, at one point, testified that the plan was actually to try and get Martin out of the picture. He testified that Special Agent Duquette, on September 27th, spoke with Richardson directly about getting more heroin. Carr explained that they were trying to get Martin out of the fray and deal with Richardson directly. As Carr said, the typical practice of the agents was to "try to find the source" and "cut out the middleman," i.e., Martin. This evidence is of no help to Martin and not important to our analysis. For one, it cuts against Martin's theory that a second deal was in the works. But more importantly, as we said, our focus is on the defendant's intentions and not law enforcement's.

[15] Special Agent Bridges was part of the MDEA surveillance team involved in the September 27 and October 11 transactions.

contact with Nicole Martin" on October 11, 2001 (emphasis added). Bridges's report further states that when Duquette approached Martin for more heroin, Martin stated she "did not have anything right now, but to come back in an hour, and she could help [Special Agent] Duquette out then." That Duquette was going to "attempt" to contact Martin on October 11th, and that Martin did not have "anything" -- be it heroin or a supplier -- in place when the two met cuts against Martin's claim that she and Duquette had previously agreed to meet for a second drug transaction. If anything can be inferred, it is that Martin was caught off-guard by Special Agent Duquette's October visit.

In addition to the dearth of evidence tending to support the existence of an agreement for -- or expectancy of -- a second transaction, there was other evidence bolstering the district court's determination that Martin's two prior convictions were not related by a single common scheme or plan. Namely, there is a variety of factual dissimilarities between the September 2001 offense and the October 2001 offense. The drug deals occurred in two different towns, two weeks apart. Martin obtained the drugs from distinct sources, whom each charged different amounts for the drugs. The means by which Martin herself was compensated were also at odds. In connection with the first deal, her payoff was a bag of heroin. For the second deal, it was $50 cash.

Given the above, we have no trouble concluding that there is enough evidence on the record to sustain the district court's factual finding that Martin had not agreed to, planned, or anticipated the October 2001 offense prior to or during the commission of the September 2001 offense. This is a plausible interpretation of the facts; we will not second-guess it. Moreover, the district court did not clearly err when it determined that Martin's two offenses were not part of a single common scheme or plan and therefore should be counted separately. There was ample record support for this conclusion, as chronicled above. The district court properly sentenced her as a career offender pursuant to § 4B1.1(a) of the Guidelines.

## IV. CONCLUSION

We are mindful that our ruling results in Martin receiving a significantly longer sentence than she would have had she not been sentenced as a career offender. The result is unquestionably unfortunate for Martin. That being said, there is simply no merit to her claims of error. For the aforementioned reasons, we affirm.