# United States Court of Appeals
## For the First Circuit

No. 10-1252

UNITED STATES OF AMERICA,

Appellee,

v.

ORLANDO CARRERO-HERNÁNDEZ, A/K/A BUHO,

Defendant, Appellant.

APPEAL FROM THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF PUERTO RICO

[Hon. José A. Fusté, U.S. District Judge]

Before

Lynch, Chief Judge,
Torruella and Lipez, Circuit Judges.

Rafael F. Castro-Lang for appellant.
Carlos R. Cardona, Assistant United States Attorney, with whom
Rosa Emilia Rodríguez-Vélez, United States Attorney, Nelson Pérez-
Sosa, Assistant United States Attorney, Chief, Appellate Division,
and George A. Massucco-LaTaif, Assistant United States Attorney,
were on brief, for appellee.

July 6, 2011

**TORRUELLA**, **Circuit Judge**.   In September 2009, Orlando Carrero-Hernández ("Carrero") pled guilty in federal district court to two felony drug charges stemming from his involvement in a scheme to import large quantities of cocaine into Puerto Rico.  On appeal, Carrero raises two challenges to the sentence he received. First, Carrero contends that the district court improperly imposed a two-level sentencing enhancement to his base offense level based on the court's finding that he recklessly endangered others during a flight from the police.  Second, he argues that the district court improperly imposed a four-level enhancement based on its finding that he led or controlled others in the scheme.  After considering the issues presented, we now affirm.

## I.

The facts are largely uncontested.  In the early part of 2008, Carrero was involved in a plot to smuggle cocaine into Puerto Rico.  On January 10, 2008, Carrero met with Richard Avilés Abdul ("Avilés"), an undercover Puerto Rico police officer posing as a not entirely upstanding boat captain.  The meeting was arranged by a criminal informant named David Quesón, a/k/a "El Gordo."  At the meeting, Carrero sought Avilés's aid in importing a large quantity -- initial discussions were for six hundred kilograms -- of cocaine from the Dominican Republic.  Carrero offered Avilés $270,000 to retrieve the cocaine from a Dominican ship at a meeting point

-2-

located some forty-three miles out in open water.[1]  During this meeting, Carrero and Avilés discussed logistics for the transfer, as well as Avilés's compensation.  In addition, Carrero told Avilés that he had used the same offloading point to import twenty-two previous drug shipments, that he did not hire young boys, that one of his other boat captains could not work on account of a hand injury, and that as long as Avilés "deal[t] well" with him, he would guarantee him work "for a long time."  The following day, Carrero advised Avilés that "they" had reduced the shipment to three hundred kilograms, but (according to Carrero's presentence report ("PSR")) that there were two thousand kilograms of cocaine waiting to be brought over from the Dominican Republic in subsequent trips, presumably if the initial run was successful.  In light of the reduced size of the shipment, the two agreed to reduce Avilés's compensation to $160,000.

A few days later, Carrero informed Avilés that the transfer was scheduled to occur the following day, and arranged for El Gordo to deliver $450 to Avilés to cover the cost of fuel for the trip.  The next day, however, Carrero had to inform Avilés that the transfer had to be called off because the ship from the Dominican Republic had been unable to secure the necessary permits.  Carrero agreed to pay Avilés $400 for his troubles, and they

---

[1]  Carrero later clarified that the drop-off point was forty-one miles offshore, not forty-three.

-3-

arranged to meet with El Gordo and Carrero's associate (and eventual co-defendant), Joaquín Lassalle-Velázquez ("Lassalle") later that day. At the meeting, Lassalle paid Avilés the $400.

Shortly thereafter, on January 16, Lassalle phoned Avilés to tell him that the permit problem had been resolved, and that the hand-off was scheduled for January 17. Later that day, Avilés met with Lassalle in person to receive the precise coordinates and code word for the transfer. Avilés, accompanied by law enforcement officers, traveled to the exchange point at the designated time, but the Dominican ship never arrived and Avilés returned empty-handed. After some back and forth, Carrero agreed to reimburse Avilés $3,000 for his expenses, including damage sustained by the boat. Lassalle paid Avilés the $3,000 at a meeting on January 23. When Avilés complained about the amount, Lassalle responded that he could not pay Avilés more than $3,000 because he needed to pay "the boys," and that the costs of the delayed shipment would come out of his own profits, whereas for Avilés "the profit is solid." Lassalle further indicated that his employees were not paid if they returned empty-handed, and that he had recently fired one of his employees for failing to count the kilos after receiving the transfer.

Avilés met again with El Gordo, Lassalle and Carrero two days later. At this meeting, Lassalle once again gave Avilés the coordinates for the hand-off, now scheduled for later that evening,

-4-

and Carrero paid Avilés for his anticipated fuel costs. This time the Dominican ship arrived and, after Avilés pronounced the code word, its four crew members loaded nine bales of cocaine onto Avilés's boat. An aircraft from the Air and Marine Unit of United States Customs and Border Protection was following the transaction and obtained photographs and video of the events, and vectored the coordinates to a United States Coast Guard cutter. After leaving the rendezvous point, the Coast Guard cutter intercepted the Dominican vessel, arrested its four crew members and seized several items, including a semi-automatic handgun and ammunition.

Meanwhile, Avilés headed back to Puerto Rico, stopping en route to exchange the real cocaine for a fake substitute. As he neared the coast, Avilés phoned Carrero to ask if he was ready to take delivery of the cocaine. Carrero indicated that both he and Lassalle were present at the offload site. Police surveillance at the offload site detected the presence of six individuals. Just as the offloading was set to begin, the police sprung the trap and moved in to make arrests. Unfortunately, however, things did not go according to plan and a shootout ensued. Lassalle beat a hasty retreat in his red pickup truck, firing parting shots at the police as he fled. Both he and Carrero managed to evade capture that evening. Arrest warrants were issued, and a search began.

Early in the evening of January 28 -- a few days after the failed shipment -- Carrero was spotted driving around

Aguadilla.  The police, including Avilés, took up the pursuit. Once Carrero realized he was being pursued, he quickly accelerated, reaching speeds later estimated (by Avilés) of around forty to forty-five miles per hour.  Carrero was at this point driving on small back roads in the early evening, in a residential neighborhood in which one could assume that people might be out and about.  Carrero did not stop or slow at intersections.  After hitting a dead end, Carrero abandoned the truck and fled on foot through the woods.  The police followed suit, and one police officer fell and injured his chin in the process.  Carrero again managed to evade arrest, and was not finally run to ground until some two months later.  Carrero was ultimately arrested without incident on April 4, 2008.

At sentencing, Avilés testified that Carrero was driving too fast for the area, that the pursuit went over a large hill with obstructed sight lines, and that the police lost him because it would have been "pretty irresponsible" for them to pursue him at the speed he was driving.  When asked whether pedestrians were present during the chase, Avilés replied: "[t]his happened very fast.  I can tell you that after he left, abandoned the vehicle . . . [the area] got full of kids, of females, males, everything, everybody."

Carrero and Lassalle, along with four co-defendants, were charged with two felony drug counts, and a joint trial began on

September 14, 2009.[2]  Carrero and Lassalle entered straight guilty pleas prior to the trial's conclusion, and the four remaining co-defendants were convicted.

Carrero's PSR recommended the two sentence enhancements that are the subject of this appeal.  The first was a two-level enhancement for reckless endangerment during flight, pursuant to United States Sentencing Guidelines Manual ("U.S.S.G.") § 3C1.2 (2009), relating specifically to Carrero's flight from the police on the evening of January 28.  Second, the PSR recommended a four-level enhancement on account of his role in the offense pursuant to U.S.S.G. § 3B1.1(a).  Carrero objected to both sentencing enhancements.  At sentencing, the district court entertained testimony and arguments on both issues.  The court overruled both of Carrero's objections.[3]  The court then sentenced Carrero to 360 months' imprisonment and a five-year term of supervised release. Judgment was entered on February 1, 2010, and Carrero appealed that same day.

---

[2]  Carrero's co-defendants were the four crew members from the Dominican "mother ship."  The individuals present with Carrero and Lassalle at the offloading point remain unknown.

[3]  Sentencing wasn't a complete wash for Carrero.  The district court also rejected the government's request for an enhancement based on the weapon found on board the Dominican supply boat, under U.S.S.G. § 2D1.1(b)(1), and, over the government's objections, deducted two points for acceptance of responsibility, pursuant to § 3E1.1(a) of the Sentencing Guidelines.

## II.

## A.

Carrero claims the district court made two mistakes in sentencing him. The first, he claims, is that the district court should not have increased his base offense level by two steps, pursuant to U.S.S.G. § 3C1.2, on account of his flight from the police.

Section 3C1.2 provides that:

> if the defendant recklessly created a substantial risk of death or serious bodily injury to another person in the course of fleeing from a law enforcement officer, increase by 2 levels.

Recklessness requires that the defendant was "aware of the risk created by his conduct and the risk was of such a nature and degree that to disregard that risk constituted a gross deviation from the standard of care that a reasonable person would exercise in such a situation." U.S.S.G. § 2A1.4, cmt. n.1; see id. § 3C1.2, cmt. n. 2.

As we have previously noted, the Sentencing Commission promulgated § 3C1.2 in order to adopt the view that "mere flight from arrest was not sufficient for an adjustment, but that flight plus endangerment was enough." United States v. Bell, 953 F.2d 6, 10 (1st Cir. 1992). The question is what level of endangerment is called for.

-8-

Carrero contends that his conduct -- driving forty-five miles per hour in a residential neighborhood -- was not nearly so dangerous as other § 3C1.2 enhancement cases.  He further points out that Avilés conceded that the chase was brief, and that the street filled with people after Carrero had abandoned the truck, presumably implying that the streets were quiet during the chase itself.  Therefore, Carrero urges, his flight did not create a substantial risk of death or serious bodily injury, and it was error to apply the § 3C1.2 enhancement.

**B.**

We review a district court's interpretation of the "legal meaning and scope" of a sentencing guideline de novo.  United States v. Thompson, 32 F.3d 1, 4 (1st Cir. 1994).  However, "we review the court's factfinding for clear error, giving due deference to the court's application of the guidelines to the facts."  Id.

It is true that § 3C1.2 cases often involve rather more egregious conduct.  See United States v. Cruz, 213 F.3d 1, 5 (1st Cir. 2000) (affirming a § 3C1.2 enhancement because the defendant led police officers on a high-speed chase, rammed several police vehicles, drove onto the sidewalk and crashed his vehicle); United States v. Alicea, 205 F.3d 480, 482, 486 (1st Cir. 2000) (affirming § 3C1.2 enhancement involving similar conduct as in Cruz, with the additional excitement of gunshots fired at the pursuing officers).

We have not held, however, that such wildly dangerous conduct is the minimum required under § 3C1.2.

Other courts have concluded that less egregious, though still reckless, conduct can indeed qualify under § 3C1.2. For instance, United States v. Fernandez, 436 F. Supp. 2d 983, 985 (E.D. Wis. 2006), involved very similar facts to the present case. The court there imposed a § 3C1.2 enhancement after the defendant led the police on a 1.8-mile chase that "did not greatly exceed the posted speed limit," reached a dead end and then, for reasons that are not immediately apparent from the record, "abandoned his vehicle, climbed an embankment and jumped into Lake Michigan," from which he later had to be retrieved by a K-9 unit. Id. In United States v. Luna, 21 F.3d 874, 885 (9th Cir. 1994), the Ninth Circuit upheld a § 3C1.2 enhancement after the defendant led the police on a short car chase and then fled on foot, abandoning the car in a residential area with the engine running.[4] Finally, in United States v. Chandler, 12 F.3d 1427 (7th Cir. 1994), the Seventh Circuit upheld a § 3C1.2 enhancement after a car chase that passed through a residential neighborhood at dusk, and during which the defendant "traveled at speeds that ranged from thirty-five to fifty miles per hour while swerving from lane to lane to prevent the

---

[4] Unlike the present case, in Luna there was evidence that the driver stopped and, as a police officer approached on foot, reached toward the floorboard of the car, where a gun was later found. Luna, 21 F.3d at 885. It does not appear that any firearms were involved in Carrero's January 28 flight.

police from going around him."  Id. at 1433.  The court noted that this conduct "might very well have resulted in injury" to others. Id.

Returning to the facts of the present case, it is surely relevant that the chase, even if brief and not conducted at stupendously high speeds, occurred on small back roads in a heavily populated area during the early evening.  The record indicates that the streets along which Carrero was driving were lined with houses, and that Carrero took several turns at a high rate of speed. Indeed, Avilés testified that the pursuing officers had to "basically stop" at those corners to make sure that they themselves did not cause injury, and that continuing the chase at the speed Carrero was going would have been "pretty irresponsible."  Avilés further testified that Carrero led the pursuing officers over a large hill, and that "when you're more or less in the middle of the hill, you can't see absolutely nothing what's in the other side. Absolutely nothing."  Under these conditions, the risk of serious injury or death could hardly have been more obvious.  As the district court recognized, Carrero's driving created a high likelihood of collision with pedestrians and/or oncoming traffic, with what could very well have been disastrous results.  In imposing the enhancement, the court noted that although the chase "[c]ould have been a lot worse," still Carrero "could have killed somebody with a car.  The agents could have killed some pedestrian

-11-

with a car. And other things could have happened, a crash, God knows what." We agree.[5]

## III.

## A.

Carrero also contends that the district court erred in imposing, pursuant to U.S.S.G. § 3B1.1(a), a four-level enhancement based on its finding that he was a leader or organizer in the drug running scheme.

Section 3B1.1(a) of the guidelines authorizes increasing a defendant's offense level "[i]f the defendant was an organizer or leader of a criminal activity that involved five or more participants or was otherwise extensive." Government agents and criminal informants are not "participants" under the guideline. U.S.S.G. § 3B1.1, cmt. n.1; see also United States v. Ramos-Paulino, 488 F.3d 459, 463-64 (1st Cir. 2007). Enhancement under § 3B1.1(a) requires a district court to make (1) a "status determination," i.e., that "the defendant acted as an organizer or leader of the criminal activity," as well as (2) a "scope determination," i.e., "that the criminal activity met either the

_____

[5] The district court appeared to place at least some weight on the fact that a police officer sustained a minor injury while pursuing Carrero after Carrero abandoned his vehicle and lit off on foot. It is not clear what relevance this injury has to the analysis, as § 3C1.2 operates on the basis of risk, not outcomes. In any case, we do not further consider whether any of Carrero's actions after he abandoned his car satisfied § 3C1.2's requirements, as the risk imposed by Carrero's reckless driving is sufficient on its own to sustain the enhancement under § 3C1.2.

-12-

numerosity or the extensiveness benchmarks established by the guideline." United States v. Tejada-Beltrán, 50 F.3d 105, 111 (1st Cir. 1995). Here, Carrero has not contested the scope requirement, and so the only question before us is status.

In order to meet § 3B1.1(a)'s status requirement, the defendant must have either organized or led at least one other participant in the offense. U.S.S.G. § 3B1.1(a), cmt. n.2. As we have noted on an earlier occasion,

> section 3B1.1 does not apply to a defendant who merely organizes or supervises criminal activity that is executed without the aid of others. Instead, the defendant must have exercised some degree of control over others involved in the commission of the offense or he must have been responsible for organizing others for the purpose of carrying out the crime.

United States v. Fuller, 897 F.2d 1217, 1220 (1st Cir. 1990). While a defendant "may be classified as an organizer, though perhaps not as a leader, if he coordinates others so as to facilitate the commission of criminal activity," Tejada-Beltrán, 50 F.3d at 112, our cases distinguish between organizing criminal activities and organizing criminal actors.[6] Only the latter may be

---

[6] The application notes to § 3B1.1 make clear that a "participant" is a "person who is criminally responsible for the commission of the offense, but need not have been convicted." U.S.S.G. § 3B1.1, cmt. n.1. In considering whether a criminal enterprise was "otherwise extensive," for purposes of the scope prong, on the other hand, one may look at whether it used the "unknowing service of many outsiders." Id. at n.3. Thus, it appears that criminal culpability is a prerequisite for the "status" inquiry (i.e., whether the defendant acted as an organizer, leader, manager, or

-13-

used to ground an enhancement under § 3B1.1(a).  See United States v. Jones, 523 F.3d 31, 43 (1st Cir. 2008) ("[I]t is not enough that the defendant merely controlled, organized, or managed criminal activities[; he] must instead control, organize, or manage criminal actors."); see also United States v. Cruz, 120 F.3d 1, 3 (1st Cir. 1997) (en banc) (noting that upward adjustment under § 3B1.1(c) requires a finding that "the defendant, in committing the offense, exercised control over, organized, or was otherwise responsible for superintending the activities of, at least one of those other persons") (emphasis added).

Carrero maintains that the evidence did not establish that he exercised control over any of the other participants, that his role was rather limited to "coordination of activities," and that Lassalle was actually the leader of the organization.  Carrero insists that his role was only to recruit boat captains to pick up the drugs.  Although Carrero clearly exercised supervisory authority over Avilés -- he recruited him into the venture, negotiated his cut, paid his expenses, and told him where and when to make the pick up -- Carrero notes, correctly, that neither Avilés nor El Gordo can be considered participants under § 3B1.1(a), as the former was a government agent and the latter a criminal informant.  As for the other participants in the scheme,

_____

supervisor) but not for the "scope" inquiry, where that inquiry is premised on extensiveness rather than numerosity.

-14-

Carrero insists that (a) the Dominican crew members were supervised by the sender in the Dominican Republic, not Carrero; and (b) the offload crew in Puerto Rico was under Lassalle's control, as according to Carrero, Lassalle was the one who actually owned the drugs and made those staffing decisions. Carrero concedes that he played an "important role in the conspiracy" insofar as his role was to make contacts and provide information and coordinates, but argues that this role constitutes organization of the scheme's activities, not of its (bona fide) participants.

**B.**

At sentencing, the burden is on the government to show that an upward role-in-the-offense adjustment is appropriate by a preponderance of the evidence. United States v. Al-Rikabi, 606 F.3d 11, 14 (1st Cir. 2010). We have cautioned that "[a]ssessing a defendant's role in the offense is a fact-specific task," requiring that "considerable respect be paid to the views of the nisi prius court." Tejada-Beltrán, 50 F.3d at 110 (citing United States v. McDowell, 918 F.2d 1004, 1011 (1st Cir. 1990)). Therefore, "unless a mistake of law looms . . . a sentencing court's determination of a defendant's role will be set aside only for clear error." Id. at 110-11; Alicea, 205 F.3d at 485. Because any error must be clear, it stands to reason that "when there are two plausible views of the record, the sentencing court's adoption

-15-

of one such view cannot be clearly erroneous."  United States v.
St. Cyr, 977 F.2d 698, 706 (1st Cir. 1992).

The record does not present a perfectly clear picture of
the relationship between Carrero and Lassalle.  Much of it suggests
that Carrero and Lassalle were partners.  Notably, Lassalle stated
to Avilés that neither he nor Carrero was authorized to speak
without the other's approval, that his profit was less because he
had to "pay all the guys" and that he had recently had to fire an
employee.  In addition, Lassalle assured Avilés that he would be
given the "pick up," noted that he was "always offering [Avilés]
jobs," and occasionally negotiated with Avilés about his
compensation.  Carrero also at times referred to Lassalle as his
"partner."

On the other hand, the evidence does suggest that on at
least some occasions, Carrero exercised at least some degree of
leadership or organizational control over Lassalle and others.
After negotiating with Avilés, Carrero arranged for Lassalle to
deliver money to compensate Avilés for the damage to his boat, and
Carrero also arranged for Lassalle to deliver the coordinates of
the transfer point to Avilés.[7]  In urging Avilés to meet with
Lassalle, Carrero at one point stated that "his" system would not

---

[7]    The evidence does not, however, support the government's
suggestion that it was solely Carrero's decision to compensate
Avilés.  What El Gordo reported to Avilés was that Carrero and
Lassalle would pay him "with money from their pockets" because "the
Dominicans" had refused to pay for the damages.  (Emphasis added).

-16-

work without Lassalle's cooperation. This is enough to satisfy § 3B1.1(a)'s status requirement, which, as previously noted, requires only that the defendant must have either organized or led at least one other participant in the offense. U.S.S.G. § 3B1.1(a), cmt. n.2.

In light of his role supervising Lassalle, it cannot be said that the record does not support a finding that Carrero was a leader or organizer within the sense contemplated by § 3B1.1(a). Because we are not "left with the definite and firm conviction that a mistake has been committed," we do not find that the enhancement under § 3B1.1(a) was clear error. United States v. González-Meléndez, 594 F.3d 28, 35 (1st Cir. 2010) (citing United States v. Arbour, 559 F.3d 50, 53 (1st Cir. 2009)); see also St. Cyr, 977 F.2d at 706 ("[W]hen there are two plausible views of the record, the sentencing court's adoption of one such view cannot be clearly erroneous.").[8]

---

[8] The government also contends that the upward role adjustment was justifiable based on the fact that Carrero exercised control over the assets of the drug operation. This contention is without merit. Finding that a defendant managed the assets of a criminal enterprise "may ground an upward departure but not an upward role-in-the-offense." Ramos-Paulino, 488 F.3d at 464. Therefore, although a finding that a defendant managed a criminal enterprise's assets may warrant a discretionary departure from the sentencing guidelines, such a finding does not warrant a sentencing enhancement under § 3B1.1(a). Unlike the government, the district court made no such error in applying the guideline.

**IV.**

For the reasons given above, Carrero's sentence is **affirmed**.