# United States Court of Appeals
## For the First Circuit

No. 20-1612

UNITED STATES OF AMERICA,

Appellee,

v.

CHRISTOPHER BROWN,

Defendant, Appellant.

APPEAL FROM THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF MASSACHUSETTS

[Hon. Timothy S. Hillman, U.S. District Judge]

Before

Lynch, Lipez, and Thompson,
Circuit Judges.

Christine DeMaso, Assistant Federal Public Defender, for appellant.
Karen L. Eisenstadt, Assistant United States Attorney, with whom Andrew E. Lelling, United States Attorney, was on brief, for appellee.

April 14, 2022

**LIPEZ, Circuit Judge.** Appellant Christopher Brown pled guilty, pursuant to a written plea agreement, to being a felon in possession of a firearm in violation of 18 U.S.C. § 922(g)(1). The district court sentenced Brown to 41 months' imprisonment. Brown challenges that sentence on two grounds. He argues that the district court erroneously calculated his sentencing guidelines range by imposing a two-point enhancement for reckless endangerment during flight. See U.S.S.G. § 3C1.2. He also argues that the government paid mere "lip service" to the plea agreement at sentencing and, in so doing, breached the agreement. Because we disagree with Brown on both grounds, we affirm his sentence.

## I.

This sentencing appeal follows a guilty plea. Thus, "we glean the relevant facts from the plea agreement, the undisputed sections of the presentence investigation report (PSR), and the transcripts of [the] change-of-plea and sentencing hearings." United States v. Ubiles-Rosario, 867 F.3d 277, 280 n.2 (1st Cir. 2017).

### A. Factual Background

Shortly after 2:00 a.m. on November 25, 2018, Worcester Police Officer Trevis Coleman was responding to a traffic stop when he observed Christopher Brown getting out of an SUV in front of an apartment complex. Coleman was familiar with Brown and his criminal record, including his affiliation with a violent gang and

his inability to lawfully carry a firearm. When Coleman observed Brown exiting the SUV, he saw a gun protruding from Brown's waistband. Coleman exited his vehicle, approached Brown, and instructed him to put his hands behind his back.

Brown refused to do so and asked Coleman why he was being stopped. Coleman responded that he would provide more information once he placed Brown in handcuffs.[1] Coleman attempted to handcuff Brown, but Brown pulled away, yelling "Nisha, help, Nisha, help, open the door." Brown eventually broke his hands free from Coleman, who then wrapped his arms around Brown's waist in an attempt to retrieve the gun that he had previously observed protruding from Brown's waistband. He was unable to locate the gun. Brown broke free from Coleman's grip and ran toward the entrance of the apartment complex, tried to open the door, and again yelled for "Nisha" to help him. Coleman radioed for back-up and continued to pursue Brown. He removed his taser and warned Brown that he would discharge it if Brown continued to resist arrest. Brown then ran down the street. Coleman indeed discharged his taser, "but it had no effect on Brown [who] kept running."

---

[1] Coleman was driving an unmarked cruiser on the night of the incident. Nevertheless, in light of the undisputed facts in the record, and the absence of an argument to the contrary by appellant, we think it is a fair inference that Brown knew Coleman was a police officer. Indeed, the dispute over the application of the guidelines would make no sense otherwise.

Moments later, Coleman heard a woman yelling "Chris," which caused Brown to reverse course and run back toward the apartment building. The woman opened the door to the building and Brown ran inside. Coleman attempted to follow Brown, but Brown pushed Coleman back outside and, in the process, grabbed Coleman's taser.[2] The taser eventually ended up on the floor of the entryway to the apartment building. Coleman continued to pursue Brown, pulling him outside the building, and eventually pinned him against a vehicle on the street while waiting for back-up.

Back-up officers arrived and Brown continued resisting Coleman's attempts to arrest him, apparently trying "to throw Officer Coleman over his shoulders."[3] With some assistance from the other officers on the scene, Coleman was able to force Brown to the ground. Brown pinned his hands underneath his body and continued to resist arrest. Coleman attempted to use his taser again, but, again, it had no effect. Using physical force -- including "punches and knee strikes" -- the officers were finally able to subdue Brown.

---

[2] Brown objected to the statement in the PSR that he grabbed Coleman's taser. The district court apparently adopted the facts as presented in the PSR but did not rule specifically on Brown's objections. As we explain, however, this disputed fact plays no role in our analysis.

[3] Brown also objected to this statement in the PSR. He argues that he "was trying to free himself from the officer, not to throw him." Again, this fact is not necessary to our analysis.

After Brown was restrained, Coleman searched the area for the gun that he had observed protruding from Brown's waistband. Coleman located a loaded, black .38-caliber revolver on the street where his encounter with Brown began.

**B. The Plea Agreement**

In August 2019, a federal grand jury returned a superseding indictment charging Brown with one count of being a felon in possession of a firearm in violation of 18 U.S.C. § 922(g)(1). He agreed to plead guilty to the superseding indictment pursuant to a written plea agreement.

In the plea agreement, the government agreed that Brown's base offense level ("BOL") was 20, see U.S.S.G. § 2K2.1(a)(4)(A), and that it should be decreased by three levels for acceptance of responsibility, see U.S.S.G. § 3E1.1, for a total offense level ("TOL") of 17. Brown agreed that the district court "[wa]s not required to follow th[at] calculation" and waived his right to appeal his conviction or any sentence of 37 months or less. The agreement did not include a calculation of Brown's criminal history category or the resulting guidelines sentencing range ("GSR"). Instead, the government promised to recommend a sentence "within the [g]uidelines sentencing range as calculated by the U.S. Attorney at sentencing." The plea agreement also provided that "[n]othing in this Plea Agreement affects the U.S. Attorney's obligation to provide the [c]ourt and the U.S. Probation

Office with accurate and complete information regarding this case."

The court held a change-of-plea hearing at which Brown entered his guilty plea. At that hearing, the court asked the government to provide the applicable sentencing range under the guidelines. The government stated that the applicable GSR with the three-level decrease for acceptance of responsibility was "30 to 37 months; without acceptance, 41 to 51 months." The court informed Brown that "while [the court] put[s] a great deal of faith in the negotiations between the lawyers[,] th[e] plea agreement is really just a recommendation," and the court "could reject th[at] recommendation[]" and "impose a sentence that may be more severe than . . . anticipate[d]," without allowing Brown to withdraw his guilty plea. Brown stated that he understood and wished to proceed with his guilty plea.

## C. The PSR

The Probation Office prepared a PSR that calculated the applicable GSR differently than the GSR set forth in the plea agreement. Probation agreed that Brown's BOL was 20 but applied a two-level increase for "[o]bstruction of [j]ustice." Probation explained that Brown

> recklessly created a substantial risk of death or serious bodily injury to another person in the course of fleeing from a law enforcement officer, to include pushing the arresting officer, grabbing his taser, and attempting to

- 6 -

> throw him over his shoulders. In the course
> of struggling with the officer[,]the
> defendant's firearm ended up in the street
> before it could be safely retrieved . . . . As
> such, 2 levels are added. (Citing U.S.S.G.
> § 3C1.2.)

Brown objected to this characterization in the PSR.[4] Specifically, Brown objected "that the gun had already been dislodged from Brown's waist" by the time Coleman felt around his waist. Brown points to the PSR's statement that "Coleman found the gun in the same place where he first observed Brown" as additional support for his assertion that the gun had already been dislodged from his waist by the time of the struggle with Coleman. Brown reiterated this objection in his sentencing memorandum, writing that "the officer never felt the firearm or saw the firearm during the struggle. In fact, it is clear that the firearm was out of Mr. Brown's possession during the entire struggle."

Probation also applied a three-level reduction for acceptance of responsibility, resulting in a TOL of 19 (two levels higher than the TOL of 17 contemplated in the plea agreement). The PSR also concluded that Brown had a criminal history score of seven, which placed him in criminal history category ("CHC") IV. Ultimately, the PSR calculated the applicable GSR as 46 to 57 months.

---

[4] We discuss the relevance of this factual dispute infra.

- 7 -

The government did not object to the PSR. Brown objected to several factual statements (as noted above) as well as to the PSR's two-level adjustment under U.S.S.G. § 3C1.2. Noting that merely fleeing arrest is insufficient to trigger the adjustment, he argued that the facts did not support a finding that he "recklessly created a substantial risk of death or serious bodily injury to another person" in the course of his attempt to flee. And, putting aside his factual challenges to the role of the gun in this event, Brown explained that his alleged conduct of pushing an officer, grabbing the officer's taser, and attempting to throw the officer over his shoulders would not create such a risk. He also argued that the fact that the firearm ended up in the street was insufficient to warrant the adjustment because "it is unclear how [the gun] got there and . . . it was 2:00 a.m. and there was no one else on the street and the gun was there for only a brief period of time."

In response, Probation explained that the "physical encounters" with Coleman that Brown admitted to "go beyond mere flight from arrest and are squarely in the realm of resisting arrest." "Between the defendant's disposal (or inadvertent dropping) of his weapon and the presence of the officer's dislodged taser during a struggle," Probation concluded that the criteria for the two-level increase under § 3C1.2 were met.

**D. Sentencing Memoranda**

Both parties filed sentencing memoranda based on their agreed-upon calculation of a TOL of 17, the PSR's CHC of IV, and a GSR of 37 to 46 months. In his sentencing memorandum, Brown again argued that the § 3C1.2 enhancement was inapplicable and that the court should disregard that aspect of the PSR. Ultimately, Brown asked the court to impose a sentence of time served, which would have amounted to approximately 22 months, with good time.

For its part, the government asked for a "high-end guideline sentence of 46 months." The government argued that such a sentence was appropriate under the 18 U.S.C. § 3553(a) sentencing factors "because of the dangerous nature of the defendant's offense, and his substantial and violent criminal record." Specifically, the government argued that Brown's "reckless behavior" demonstrated that he was "a dangerous individual with no regard for the safety of Police Officers, the community[,] or others." The government labeled the offense as "very dangerous and violent" because "[t]he defendant's gun was loaded and his reckless and dangerous conduct toward Officer Coleman could have caused tragic consequences." The government also noted that Brown has a "long and troubling criminal history" that involved, among other things, "violence against women, guns, knives[,] and crack cocaine" and argued that Brown's "violent and reckless character

justify a significant period of incarceration to keep the community safe, to punish him[,] and to hopefully give him the needed time to reform his life."

## E. Sentencing Hearing

At sentencing, the court heard argument on whether to apply the reckless endangerment enhancement to Brown's offense level. Defense counsel started his argument by emphasizing that the plea agreement did not impose the enhancement. He further argued that "certain arguments made in [the government's] sentencing memo were against the plea agreement." Factually, defense counsel argued that the enhancement was inapplicable because this was "more of a run-of-the-mill resisting arrest" situation, given Brown's contention that the firearm dislodged early in the encounter before the struggle with Coleman, and the fact that the scuffle lasted less than two minutes, did not result in any injuries, and occurred on an empty street in the middle of the night.

In response, the government confirmed that "[t]he government [wa]s not asking for th[e] enhancement to be applied," and asked the court to use the agreed-upon TOL of 17. The government explained that its sentencing memorandum emphasized the nature and circumstances of the offense only in the context of applying the § 3553(a) factors.

The court recognized the absence of the enhancement in the plea agreement but nevertheless concluded that the enhancement applied. The court explained: "I think that the rationale from Matchett . . . works and is analogous."[5] Hence, the court calculated Brown's TOL as 19 and his CHC as VII for a GSR of 46 to 57 months (rather than the 37- to 46-month GSR that would apply to a TOL of 17). The court then heard sentencing recommendations from the parties.

The government asked for a high-end guidelines sentence of 46 months "because of the dangerous nature of the defendant's offense and the defendant's substantial violent criminal record." Defense counsel asked for time served. Ultimately, the court sentenced Brown to 41 months in prison. Defense counsel renewed his objection to the court's guideline calculation and to the "position that [the government] took in their sentencing memorandum." Brown appeals his sentence on those same grounds, arguing that: (1) the district court erred by imposing the two-point reckless endangerment enhancement; and (2) the government violated the plea agreement.[6]

---

[5] We further discuss this case, United States v. Matchett, 802 F.3d 1185 (11th Cir. 2015), below.

[6] Neither of these claims are covered by the waiver of appellate rights in Brown's plea agreement. He reserved the right to appeal any prison sentence longer than 37 months; the district court sentenced him to 41 months. He also reserved the right to argue that the prosecutor "engaged in intentional misconduct

## A. The Sentencing Enhancement

We review a district court's factfinding at sentencing "for clear error, giving due deference to the court's application of the guidelines to the facts." United States v. Carrero-Hernández, 643 F.3d 344, 349 (1st Cir. 2011) (quoting United States v. Thompson, 32 F.3d 1, 4 (1st Cir. 1994)). We will not find clear error in the court's application of the guidelines to the facts "as long as the district court's decision is based on reasonable inferences drawn from adequately supported facts." United States v. Martin, 749 F.3d 87, 92 (1st Cir. 2014) (quoting United States v. Santos, 357 F.3d 136, 142 (1st Cir. 2004)).

Section 3C1.2 of the Sentencing Guidelines provides for a two-level increase to a defendant's offense level "[i]f the defendant recklessly created a substantial risk of death or serious bodily injury to another person in the course of fleeing from a law enforcement officer." U.S.S.G. § 3C1.2. "Reckless" means "the defendant was aware of the risk created by his conduct and the risk was of such a nature and degree that to disregard that risk constituted a gross deviation from the standard of care that a reasonable person would exercise in such a situation." Id. § 2A1.4 cmt. n.1. The Sentencing Commission promulgated § 3C1.2

---

serious enough to entitle [him] to have his conviction or sentence overturned."

to "adopt the view that 'mere flight from arrest was not sufficient for an adjustment, but that flight plus endangerment was enough.'" Carrero-Hernández, 643 F.3d at 348 (quoting United States v. Bell, 953 F.2d 6, 10 (1st Cir. 1992)).

Many of the cases in which we have upheld the application of the § 3C1.2 enhancement involve "wildly dangerous" conduct. Carrero-Hernández, 643 F.3d at 349; see also United States v. Alicea, 205 F.3d 480, 486 (1st Cir. 2000) (firing a weapon in a public plaza occupied by police officers and bystanders); United States v. Cruz, 213 F.3d 1, 5 (1st Cir. 2000) (leading police officers on a high-speed chase, ramming vehicles, and driving on the sidewalk); United States v. Vega-Rivera, 866 F.3d 14, 19 (1st Cir. 2017) (similar). But in Carrero-Hernández we joined other courts in concluding that "less egregious, though still reckless, conduct can indeed qualify under § 3C1.2." See 643 F.3d at 349. There, we concluded that leading the police on a car chase "on small back roads in a heavily populated area during the early evening" was sufficient to warrant the enhancement. Id. We reasoned that "the risk of serious injury or death could hardly have been more obvious" due to the "high likelihood of collision with pedestrians and/or oncoming traffic" created by the defendant's driving, and held that this conduct justified the application of the § 31C.2 enhancement. Id. at 350. As in Carrero-Hernández, the question we must answer here "is what level

- 13 -

of endangerment is called for" to trigger proper application of the enhancement.  Id. at 348.

For this purpose, it is helpful to distinguish the conduct at issue in Carrero-Hernández, which we concluded transgressed the boundary separating mere "flight" from "flight plus endangerment," id. at 348-50, from the conduct at issue in United States v. Bell, 953 F.2d 6 (1st Cir. 1992), which we concluded fell below the line.  In reversing the application of the sentencing enhancement in Bell,[7] we held that even if "Bell obtained the gun for the purpose of resisting arrest and contemplated its use for a few critical seconds,"[8] his conduct did

---

[7] "Although the government and apparently the [district] court assumed that Bell's conduct was governed by § 3C1.1" -- and the district court ultimately imposed the § 3C1.1 enhancement -- we explained that "it is § 3C1.2 which in fact addresses this kind of situation" and evaluated whether Bell's conduct warranted the application of the § 3C1.2 enhancement.  953 F.2d at 10.  Section 3C1.1, like § 3C1.2, provides for a 2-level increase in the offense level.  U.S.S.G. § 3C1.1.  Section 3C1.1 applies where "(1) the defendant willingly obstructed or impeded, or attempted to obstruct or impede, the administration of justice with respect to the investigation, prosecution, or sentencing of the instant offense of conviction, and (2) the obstructive conduct related to (A) the defendant's offense of conviction and any relevant conduct; or (B) a closely related offense."  Id.

[8] The district court in Bell "concluded that Bell's possession of the firearm and ammunition 'indicate[d] a clear, willful intent to obstruct his apprehension.'"  Id. at 9.  Although we expressed skepticism that the available evidence supported this factual finding by the district court, id. at 9 n.3, we assumed, for purposes of reviewing the application of the enhancement, that the district court's inference was reasonable, id. at 9.  But even assuming that Bell fleetingly intended, during his "momentary hesitation," to use the gun to resist arrest, we nevertheless

- 14 -

not rise to the level of conduct implicated by § 3C1.2. Id. at 10. We emphasized that Bell "did not use the gun. Nor did he make any clear attempt to draw it. Although Bell's conduct came close to the line, something more -- reaching for the gun, for example -- would be required" to warrant an adjustment under § 3C1.2. Id.

Our circuit has not addressed whether physically struggling to resist arrest while possessing a firearm can provide the "something more" that § 3C1.2 requires. Like the district court, we find case law from other circuits to be instructive on this point. In United States v. Matchett, the Eleventh Circuit held that possessing a loaded firearm while resisting arrest in a physical struggle justified the application of the § 3C1.2 enhancement. 802 F.3d 1185, 1198 (11th Cir. 2015).[9] Under that circuit's precedent, "conduct that could potentially harm a police officer or a third party is sufficiently reckless" to qualify for the enhancement, and the Matchett court determined that the "drop-fire"[10] risk of the defendant's gun "created the requisite degree

---

concluded that the facts of the case did not warrant application of the enhancement. Id. at 9-10.

[9] Matchett involved a three-minute "scuffle" between a police officer and Matchett after a Terry stop revealed a firearm in Matchett's pocket and he tried to run from the officer. 802 F.3d at 1190. Throughout the struggle, the officer kept his hand on the gun in Matchett's pocket. Id. at 1197. After subduing Matchett, the officer found the loaded gun "about ten feet" away from the site of the struggle. Id. at 1190.

[10] "Drop-fire occurs when the gun is carried with a bullet in the chamber over which the hammer rests. In this situation,

- 15 -

of risk." Id. at 1197-98. Other circuits have reached similar conclusions about the relevance of a loaded firearm to the application of the § 3C1.2 enhancement. E.g., United States v. Easter, 553 F.3d 519, 523-24 (7th Cir. 2009) (per curiam) (reaching for a loaded gun while fleeing from a police officer, regardless of intent, justified enhancement); United States v. Bates, 561 F.3d 754, 757 (8th Cir. 2009) (struggling with officer while armed with a loaded weapon justified enhancement); United States v. Williams, 278 F. App'x 279, 280-81 (4th Cir. 2008) (per curiam) (briefly struggling with officers while carrying a pistol justified enhancement).

At the sentencing hearing, the district court expressed concerns about the "drop-fire" risk of appellant's firearm as it considered whether to apply the § 3C1.2 enhancement. The court asked defense counsel how to distinguish this case from Matchett. Defense counsel offered the following explanation:

> the struggle in Matchett lasted for a significant period of time. . . . [T]he defendant had the possession of the firearm the entire time during the encounter and that the officer had his hand on the firearm during the struggle . . . . [T]he parties were injured in Matchett . . . . [T]here were people surrounding [the incident], watching it, and pedestrians walking by.

---

regardless of the cock position of the hammer, a sharp blow to the hammer, such as when the gun is dropped and lands hammer first, will cause the gun to discharge." Johnson v. Colt Indus. Operating Corp., 797 F.2d 1530, 1532 (10th Cir. 1986); see also Matchett, 802 F.3d at 1198.

- 16 -

In contrast, defense counsel explained that during Brown's encounter with Coleman,

> there is literally not a single automobile that goes by during the encounter; there's not a single pedestrian that walked by during this encounter. And . . . the officer tried to grab for the firearm but couldn't find it. And the only conclusion to reach from that is that the firearm had been disposed of by Mr. Brown not during the struggle [but] prior to the struggle, which I think is a distinction in terms of [] dropping it . . . and [the] possibility of it firing because at the end of a struggle and once he's arrested they go back and they find it at the location where he was first observed . . . . [T]he firearm's dislodged early on.

Notably, appellant's arguments at sentencing did not challenge the actual "drop-fire" risk of appellant's gun. And the arguments that appellant did set forth to distinguish his situation from Matchett -- and from the concerns about the reckless possession of firearms while resisting arrest that animated the Eleventh Circuit's reasoning -- are unavailing.

The uncontested record in this case indicates that at the outset of the encounter between Brown and Coleman, appellant had a firearm visibly tucked in the waistband of his trousers. Between Coleman's sighting of the weapon and the end of the encounter, the firearm became dislodged and fell to the ground. Although appellant disclaims knowledge of when the firearm moved from his waistband to the ground, he admits that the gun was

- 17 -

"dislodged" and he does not claim to have carefully placed the gun on the ground for safekeeping.[11]  At a minimum, then, this case involves a loaded gun falling to the ground without its possessor's knowledge during a physical struggle with a police officer.  And appellant's inattention to his loaded firearm implicates the very concerns about "drop fire" that animated Matchett.  As that court observed, § 3C1.2 punishes "reckless" conduct and "requires only that there was a substantial risk that something could have gone wrong and someone could have died or been seriously injured." 802 F.3d at 1197-98.  Losing track of and allowing a loaded gun to fall to the ground while physically resisting arrest surely qualifies as reckless conduct under the § 3C1.2 standard due to the risk of accidental firing and corresponding possibility of serious injury.[12]

---

[11] In his opening brief, appellant notes that "his conduct involved a gun only insofar as he dropped it, placed it on the ground, left it in the SUV (whose driver discarded it), or let it slide down his pantleg."  In other words, appellant has no idea what happened to the gun.

[12] It does not matter, as appellant suggests, that the gun was dislodged onto "a dark, empty street" at a time "when it was highly unlikely that anyone would walk by."  Section 3C1.2 applies when a defendant's conduct "created a substantial risk of death or serious bodily injury to another person," (emphasis added), which is defined in comment 4 to "include[] any person, except a participant in the offense who willingly participated in flight." U.S.S.G. § 3C1.2 cmt. n.4.  It suffices for purposes of the enhancement that Brown's struggle with Coleman created a substantial risk of death or serious bodily injury to the officer alone.  Cruz, 213 F.3d at 5.

For the first time on appeal, appellant argues that the district court erred in imposing the § 3C1.2 enhancement because its conclusion about the risk of drop fire was unreasonable absent affirmative record evidence of that risk. Appellant claims that

> [t]he PSR said the gun was a Taurus .38 revolver, serial number DN89861, with four rounds in the cylinder. It did not state that there was a round in the chamber over which the hammer rests, aver that the hammer was cocked, or describe whether the revolver was single or double action. While the PSR did not describe the number of chambers in the cylinder, the court could have taken judicial notice from the manufacturer's website that there are 5.

Appellant urges the court to follow United States v. Mukes, 980 F.3d 526, 538 (6th Cir. 2020), where the Sixth Circuit held that the government needed to show that a gun was both cocked and loaded at the time it was dropped to justify applying the § 3C1.2 enhancement. We decline this invitation for two reasons.

First, the circumstances of this case are distinguishable from the situation in Mukes. Whereas Mukes involved a defendant dropping a gun while fleeing arrest -- at some distance from police, see id. at 530 -- the record here is consistent with Brown's loaded gun falling to the ground during a physical struggle with a police officer, where the risk and potential consequences of accidental firing are heightened.

Second, even if we take Mukes's point that not all guns pose a risk of drop fire, it was not clearly erroneous for the

- 19 -

district court to conclude that this gun posed a risk of drop fire. As Brown himself notes, there were rounds in four of the gun's five chambers. It was reasonable for the district court to infer that Brown's loaded gun posed a risk of drop fire to Coleman.[13] See Vega-Rivera, 866 F.3d at 19 ("[T]he absence of such specific minutiae does not invalidate a finding that the defendant's actions were reckless where his actions grossly deviated from the standard of care that a reasonable person would exercise in the same situation.").

## B. The Plea Agreement

Appellant preserved his claim that the government violated the plea agreement by objecting at the sentencing hearing, and so we review that claim de novo. United States v. Davis, 923 F.3d 228, 236 (1st Cir. 2019).

Traditional principles of contract law guide our interpretation of the terms and performance of a plea agreement. United States v. Clark, 55 F.3d 9, 12 (1st Cir. 1995). But because a defendant who enters a plea agreement waives fundamental

---

[13] We need not, as appellant urges, delve into the specific firing mechanism of the gun or the precise location of the four rounds to conclude that the district court's inference was reasonable. We think it reasonable to conclude that a gun that contains a bullet possesses a probability of accidental firing. The district court is best situated to evaluate the magnitude of this risk, and the four bullets in the gun here provide adequate support for its conclusion that the risk present justified the application of the § 3C1.2 enhancement.

constitutional rights, we "hold prosecutors to 'the most meticulous standards of promise and performance.'" United States v. Marín-Echeverri, 846 F.3d 473, 478 (1st Cir. 2017) (quoting United States v. Almonte-Nuñez, 771 F.3d 84, 89 (1st Cir. 2014)). The government cannot satisfy its obligations under a plea agreement by mere "lip service." See id. ("Such standards require more than lip service to, or technical compliance with, the terms of a plea agreement. . . . [I]t is possible for a prosecutor to undercut a plea agreement while paying lip service to its covenants." (quoting Almonte-Nuñez, 771 F.3d at 89-91)). In addition to entitlement to the government's technical compliance with the agreement, appellant is entitled to the "benefit of the bargain" and the "good faith" of the prosecutor. Ubiles-Rosario, 867 F.3d at 283 (quoting United States v. Matos-Quiñones, 456 F.3d 14, 24 (1st Cir. 2006)). We consider "the totality of the circumstances" in determining whether the government has failed to uphold its part of the bargain. See id. ("There is, of course, '[n]o magic formula' for assessing whether a prosecutor has complied with a sentencing recommendation in a plea agreement. . . . [W]e examine the totality of the circumstances to determine whether 'the prosecutor's overall conduct [is] . . . reasonably consistent with making such a recommendation, rather than the reverse.'" (citations omitted) (quoting United States v. Gonczy, 357 F.3d 50, 54 (1st Cir. 2004)).

In both its sentencing memorandum and at the sentencing hearing, the government asked the court to impose a sentence based on a TOL of 17, as provided for in the plea agreement. On appeal, appellant nevertheless presents two theories in arguing that the government's actions constitute mere lip service to that agreement. One theory, based on the government's inaction, posits that the government violated the plea agreement by failing to object to the PSR's inclusion of the § 3C1.2 enhancement or to discourage the district court from imposing the enhancement. But the plea agreement did not require the government to do either of these things. Absent an affirmative obligation to do so, the government did not violate the terms of the plea agreement by failing to affirmatively state that the § 3C1.2 enhancement should not apply. United States v. Luis Rivera-Cruz, 878 F.3d 404, 409-10 (1st Cir. 2017); see also Davis, 923 F.3d at 239.

Appellant's other theory characterizes the government's arguments at the sentencing hearing as "undercutting" its stated recommendation of a TOL of 17. By describing appellant's behavior as "reckless" and "show[ing] absolutely no care or concern for safety," appellant contends that the prosecutor implicitly argued for the § 3C1.2 enhancement to apply. This argument, too, is unavailing.

Our case law makes clear that a plea agreement cannot impair the government's "solemn obligation to provide relevant

information to the sentencing court." Ubiles-Rosario, 867 F.3d at 283 (quoting Almonte-Nuñez, 771 F.3d at 90); see also 18 U.S.C. § 3661 ("No limitation shall be placed on the information concerning the background, character, and conduct of a person convicted of an offense which a court of the United States may receive and consider for the purpose of imposing an appropriate sentence."). By statute, the sentencing court must consider several factors when imposing a sentence, see 18 U.S.C. § 3553(a), and it "has a right to expect that the prosecutor" will be forthcoming with "all relevant facts," United States v. Saxena, 229 F.3d 1, 6 (1st Cir. 2000) (quoting United States v. Hogan, 862 F.2d 386, 389 (1st Cir. 1988)). The government's conduct in this case struck a permissible balance between its statutory obligation of candor to the court and its plea-agreement obligations to appellant. Indeed, the government conveyed to the court "early, often, and throughout the sentencing" hearing that it was requesting a sentence based on a TOL calculation of 17. Ubiles-Rosario, 867 F.3d at 286-87. The government's repeated recommendations of this TOL were not "impermissibly equivocal, apologetic, or begrudging." Davis, 923 F.3d at 239.

The government explained that it sought a high-end guideline sentence of 46 months -- based on a TOL of 17 -- in part due to the dangerous nature of Brown's conduct. This sentence was within the range expressly contemplated by the plea, which did not

prevent the government from seeking a high-end sentence. Cf. Gonczy, 357 F.3d at 54 (holding that the government breached its promise in a plea agreement to seek a low-end sentence by requesting a low-end sentence "at a minimum" and "undercut[ting], if not eviscerat[ing]," the initial recommendation (emphasis added)). Because the agreement permitted the government to request a sentence "within the [g]uidelines sentencing range as calculated by the U.S. Attorney at sentencing," it was entitled to request this sentence and to support its high-end recommendation with reference to the § 3553(a) factors, including details about the nature of Brown's conduct and the risk it posed to another person's safety. See Davis, 923 F.3d at 238; United States v. Irizarry-Rosario, 903 F.3d 151, 154-55 (1st Cir. 2018). Consequently, the government's sentencing arguments did not constitute a breach of the plea agreement.

Affirmed.